# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 7, 2022      Decided April 15, 2022

No. 21-5091

GENTIVA HEALTH SERVICES, INC.,
APPELLANT

v.

XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS SECRETARY
OF THE U.S DEPARTMENT OF HEALTH AND HUMAN SERVICES,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02271)

---

    *W. Jerad Rissler* argued the cause for appellant. With him on the briefs was *Adriaen M. Morse, Jr.*

    *William A. Dombi* was on the brief for *amicus curiae* National Association for Home Care & Hospice in support of appellant.

*McKaye L. Neumeister*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief was *Brian M. Boynton*, Acting Assistant Attorney General at the time the brief was filed, *Michael S. Raab*, Attorney, *Janice L. Hoffman*, Associate General Counsel, U.S. Department of Health & Human Services, *Susan Maxson Lyons*, Deputy Associate General Counsel for Litigation, and *W. Charles Bailey, Jr.,* Attorney. *Alisa B. Klein*, Attorney, U.S. Department of Justice, entered an appearance.

Before: ROGERS, MILLETT and PILLARD, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Every year, millions of Americans — most of them Medicare beneficiaries — receive hospice care. Br. for Nat'l Ass'n for Home Care & Hospice as Amicus Curiae at 5–6 (citing Nat'l Hospice & Palliative Care Org., *NHCPO Facts and Figures* 6–11, 22 (2020), https://bit.ly/3gTXpmx). For eligible Medicare beneficiaries, the Medicare program reimburses hospice providers for services at per-diem rates in periodic disbursements throughout the fiscal year. That reimbursement is subject to certain fiscal-year-end adjustments, including a cap on the total reimbursement a provider may receive for inpatient hospice care ("inpatient cap") and a cap on the total reimbursement a provider may receive for all hospice services ("aggregate cap").

In 2013, budget sequestration under the Budget Control Act of 2011 forced spending reductions in nearly all federal programs, including Medicare, requiring a 2% reduction in all Medicare spending. Periodic disbursements to hospice providers were accordingly reduced by 2%. Because calculation of the aggregate cap was unaffected, the methodology initially used by Medicare's hospice

reimbursement contractors meant a hospice that exceeded its aggregate cap would receive the same total annual reimbursement — the cap amount — as in a non-sequestration year, while a hospice that came in under its aggregate cap for the year would receive the full 2% cut. To remedy this problem, the Centers for Medicare and Medicaid Services ("CMS") adopted a methodology for end-of-year reconciliation whereby overpayments were to be calculated as if sequestration had not been in effect, and any resulting overpayment was to be reduced by 2% to account for the already reduced preliminary disbursements.

Gentiva Health Services, Inc., a hospice provider, challenges CMS's methodology, contending that it violates both the Medicare statute and the Budget Control Act, and that CMS did not follow the required administrative procedures for adopting it. For the following reasons, we affirm the district court's grant of summary judgment because the Secretary correctly interpreted the Medicare statute and the Budget Control Act in devising the sequestration methodology, and because adoption of the methodology did not deprive hospice providers of adequate notice or procedural protections.

## I.

This case arises out of the interaction of two statutory schemes: the Medicare statute (specifically, the provision governing reimbursements to hospice care providers) and the Budget Control Act.

## A.

CMS, a division of the Department of Health and Human Services, administers the Medicare program, including hospice benefits for terminally ill patients under Medicare Part A. *See* 42 U.S.C. § 1395c. Hospice coverage under Medicare takes

the form of a per-patient, per-day, per-category-of-care reimbursement to the hospice care provider — that is, a flat daily rate — determined by Congress and the Secretary. *Id.* § 1395f(i)(1); *see also* 42 C.F.R. §§ 418.302, .306. The total amount of reimbursement a hospice provider may receive from Medicare in a year is subject to two caps: a cap on reimbursements for inpatient services, 42 U.S.C. § 1395x(dd)(2)(A)(iii); *see* 42 C.F.R. § 418.302(f), and, as relevant here, an "aggregate cap" on total reimbursements for all hospice services, 42 U.S.C. § 1395f(i)(2); *see* 42 C.F.R. §§ 418.301(b), .308(a).

With respect to the aggregate cap, the Medicare statute provides that reimbursements for hospice services are capped annually: "The amount of payment made under this part for hospice care provided by (or under arrangements made by) a hospice program for an accounting year may not exceed the 'cap amount' for the year . . . multiplied by the number of [M]edicare beneficiaries in the hospice program in that year." 42 U.S.C. § 1395f(i)(2)(A); *see* 42 C.F.R. § 418.309. "The intent of the [aggregate] cap was to ensure that payments for hospice care would not exceed what would have been expended by [M]edicare if the patient had been treated in a conventional setting." H.R. REP. NO. 98-333, at 1 (1983).

Medicare reimbursements for hospice services follow a two-step process. The Medicare Administrative Contractors that process reimbursements to providers make regular disbursements throughout the cap year (November 1 to October 31) based on the per-diem reimbursement rates. *See* 42 C.F.R. § 418.302(d)–(e). Then, at the end of the cap year, the hospice provider works with the contractor on a reconciliation process to determine, among other things, whether those periodic disbursements exceeded the aggregate cap (which can only be determined after the end of the cap year). *See* 42 C.F.R.

§ 418.308(c)–(d); 79 Fed. Reg. 50,452, 50,472–73 (Aug. 22, 2014). Hospices must repay any overpayments. 42 C.F.R. § 418.308(d). If a hospice concludes a contractor's determination of its overpayment obligation (if any) is mistaken, it can administratively challenge that determination before the Provider Reimbursement Review Board. *See* 42 U.S.C. § 1395oo(a); 42 C.F.R. § 418.311.

The Budget Control Act of 2011, Pub. L. No. 112-25, 125 Stat. 240, aimed to reduce federal government spending via certain budgetary devices. The Act provides that, should Congress fail to enact legislation that reduces the deficit by a specified amount, sequestration is triggered, meaning that federal government spending must be reduced by a certain percentage across the board (with certain programs exempted). *See* 2 U.S.C. § 901a. The Office of Management and Budget ("OMB") calculates, and the President implements, the percentage reduction based on statutory guidelines. *Id.*

Medicare spending is subject to sequestration, but enjoys certain special rules, including that the maximum percentage reduction that may be applied to Medicare spending is 2%. 2 U.S.C. § 901a(6)(A). With respect to Medicare Parts A and B, the Budget Control Act provides that "[t]o achieve the total percentage reduction in those programs required by section 902 or 903 of this title . . . OMB shall determine, and the applicable Presidential order . . . shall implement, the percentage reduction that shall apply . . . to individual payments for services furnished during the one-year period beginning on the first day of the first month beginning after the date the order is issued . . . such that the reduction made in payments under that order shall achieve the required total percentage reduction in those payments for that period." *Id.* § 906(d)(1).

6

**B.**

On March 1, 2013, the conditions for sequestration were triggered and OMB determined that the maximum 2% reduction to Medicare spending was required. *See* Office of Management & Budget, *OMB Report to Congress on the Joint Comm. Sequestration for Fiscal Year 2013*, at 1, 5 (2013), https://go.usa.gov/xVMJb ("OMB 2013 Sequestration Report"). CMS soon announced how this would impact Medicare providers, explaining that claims "with dates-of-service or dates-of-discharge on or after April 1, 2013, will incur a 2 percent reduction in Medicare payment." Provider Reimbursement Review Board Decision, Case No. 15-3457GC, at 5 n.32 (May 31, 2019). But at the time, CMS did not specifically address how the reduction would interact with the hospice care reimbursement process.

On March 3, 2015, CMS issued to its contractors a Technical Direction Letter providing additional guidance on the sequestration methodology for hospice reimbursement calculations while sequestration was in effect. The contractors would first determine the amount by which a given provider's periodic reimbursements were reduced by sequestration and add that figure to the net payments actually disbursed to the provider during the year, arriving at the amount that would have been disbursed in the absence of sequestration (*infra* "Figure A"). Then the contractors were to determine the provider's aggregate cap and apply the aggregate cap to Figure A, resulting in the amount of overpayment the provider would owe were sequestration not in effect (*infra* "Figure B"). Finally, to account for the sequestration reduction that had already been applied to the periodic disbursements, the contractors were to reduce Figure B by 2%, arriving at the amount of overpayment actually owed under sequestration (*infra* "Figure C"). As the district court illustrated by a

simplified example, that process resulted in uniform 2% reductions in Medicare reimbursements to hospice providers, whether or not the providers had received excess disbursements during the year and thus exceeded their aggregate cap:

| Sequestration Methodology | | |
|---|---|---|
| | Hospice A | Hospice B |
| Aggregate Cap | $1,000 | $1,000 |
| Net Disbursements | $980 | $1,176 |
| Amount Withheld for Sequestration | $20 | $24 |
| Reimbursement Without Sequestration ("Figure A") | $1,000 | $1,200 |
| Overpayment Without Sequestration ("Figure B") | $0 | $200 |
| 2% Reduced Overpayment ("Figure C") | $0 | $196 |
| Final Amount Paid by Medicare | $980 | $980 |

*Gentiva Health Servs., Inc. v. Cochran*, 523 F. Supp. 3d 81, 88 (D.D.C. 2021).

Gentiva Health Services operates hospices nationwide, including the six Gentiva-affiliated hospices here. After the 2013 cap year, the hospices initially received cap determinations prior to the issuance of the Technical Direction Letter that accordingly did not use the sequestration methodology. Once the Technical Direction Letter was shared with the contractors, the cap determinations were reopened and revised determinations were issued using the sequestration methodology. The six Gentiva-affiliated hospices were determined to owe overpayments under the sequestration methodology.

Gentiva appealed those determinations to the Provider Reimbursement Review Board. Before the Board, Gentiva argued that the Medicare statute, 42 U.S.C. § 1395f(i)(2), and the implementing regulation, 42 C.F.R. § 418.308, precluded CMS from calculating overpayments using the sequestration methodology. Instead, Gentiva argued, CMS and its contractors were required to calculate overpayments by looking only at the difference between the aggregate cap and the sum of the preliminary disbursements throughout the year — that is, by how much the preliminary payments actually received exceeded the aggregate cap ("net payments methodology"). Under this methodology the contractors would not have added back the sequestration reduction withheld from the preliminary disbursements, nor reduced the final overpayment amount by 2%, instead considering only the funds actually disbursed as compared to the aggregate cap:

| Net Payments Methodology | | |
|---|---|---|
| | Hospice A | Hospice B |
| Aggregate Cap | $1,000 | $1,000 |
| Net Disbursements | $980 | $1,176 |
| Overpayment Amount | $0 | $176 |
| Final Amount Paid by Medicare | $980 | $1,000 |

*Gentiva*, 523 F. Supp. 3d at 89. As this example demonstrates, Gentiva's net payments methodology produces different results than the sequestration methodology for a hospice that exceeds its aggregate cap, resulting in a lower amount of overpayment due. Under the sequestration methodology, the most any hospice can retain is 98% of its aggregate cap, because the methodology looks to the amount of allowable reimbursement in the absence of sequestration and then reduces that amount — which is, at most, equal to the aggregate cap — by 2%. But under the net payments methodology, a hospice can retain up to 100% of its aggregate cap.

According to Gentiva, the sequestration methodology violated the statute and the regulation by adding back the sequestration reduction withheld from the preliminary disbursements into the equation, such that — for overpayment purposes — funds the providers did not actually receive were being counted against them. As a result, the providers asserted,

they were required to repay as overpayments money they had never actually received.

The Board upheld the 2013 cap determinations, concluding that nothing in the statute or the regulation required CMS to use the net payments methodology and that the sequestration methodology was permissible. Board Decision at 9. The Board explained that the periodic disbursements are merely preliminary; they are "a proxy for costs subject to an annual cap." *Id.* at 4. Because the aggregate cap, among other possible adjustments, can only be determined and applied at the end of each fiscal year, the Board concluded, "the aggregate cap then becomes the Medicare allowable payment for the . . . cap year and, therefore, sequestration must be applied to the resulting Medicare allowable payment." *Id.* at 9. Contrary to the providers' position, the Board ruled that the sequestration methodology did not "'double dip' from any hospices" because it "reverses and adds back any sequestration amounts already deducted during the year . . . to ensure that the aggregate cap is applied separately from sequestration . . . ." *Id.* at 13.

The Board noted that the simplest way to apply the sequestration reduction would have been to issue the preliminary disbursements as usual, without any reduction, and then apply the 2% reduction "to a *full* cap year . . . [after] *the cap year has ended*." *Id.* at 11. That calculation would be straightforward: apply the aggregate cap, then apply the 2% sequestration reduction to the resulting amount. *Id.* But the problem with this method, the Board recognized, was that it required CMS "to knowingly overpay providers" by making full preliminary disbursements and waiting to reduce them at cap-year end, leading to "assessing and collecting overpayments on *all* Medicare-participating hospices[,] which would not be administratively practical." *Id.* at 12. CMS's solution — the sequestration methodology — permissibly

achieved the same result without the substantial administrative burden, the Board concluded. *Id.* at 13.

The Board not only found the sequestration methodology permissible, but also explained why the net payments methodology would not effectuate the sequestration mandate of the Budget Control Act. While "the sequestration order requires that all Medicare payments, without exception, be reduced," *id.* at 17, under the net payments methodology "no portion of the aggregate cap payments would be sequestered," which the Board found "would violate the President's sequestration order, " *id.* The same example illustrates how the net payments methodology would operate in the absence of sequestration and under sequestration:

| Without Sequestration | | |
|---|---|---|
|  | Hospice A | Hospice B |
| Aggregate Cap | $1,000 | $1,000 |
| Net Disbursements | $1,000 | $1,200 |
| Overpayment Amount | $0 | $200 |
| Final Amount Paid by Medicare | $1,000 | $1,000 |

| With 2% Sequestration | | |
|---|---|---|
| | Hospice A | Hospice B |
| Aggregate Cap | $1,000 | $1,000 |
| Net Disbursements | $980 | $1,176 |
| Overpayment Amount | $0 | $176 |
| Final Amount Paid by Medicare | $980 | $1,000 |

*Gentiva*, 523 F. Supp. 3d at 89.

Using Gentiva's net payments methodology under sequestration, hospices that do not exceed their aggregate cap — e.g., Hospice A — experience a 2% reduction in their total annual reimbursement. But hospices that do exceed their aggregate cap — e.g., Hospice B — experience no reduction in total annual reimbursement compared with a non-sequestration year. Even with the 2% reduction in periodic disbursements, Hospice B's total preliminary payments still exceed its aggregate cap, so its total annual reimbursement is $1,000 — the same as it would have been in the absence of sequestration. As a result, the net payments methodology fails to reduce Medicare spending as to Hospice B, whereas the sequestration methodology reduces Medicare spending for both Hospice A and Hospice B.

The CMS administrator declined to review the Board's decision, which therefore became the Secretary's final

determination, 42 U.S.C. § 1395oo(f)(1). Gentiva timely sought review of the Board's decision in the district court, moving for summary judgment, and the Secretary cross-moved for summary judgment. *Gentiva*, 523 F. Supp. 3d at 90. The district court granted summary judgment to the Secretary and denied summary judgment to Gentiva, ruling that the sequestration methodology did not violate either the Medicare statute or the Budget Control Act and that the providers had not shown they were deprived of adequate notice of a change in agency policy. *Id.* at 91. The district court concluded that "the Board's decision was not only reasonable, but . . . it reflect[ed] the best reading of the Medicare statute, as well as the Budget Control Act." *Id.* at 92. Gentiva appeals.

## II.

On appeal, Gentiva contends that CMS was required to use the net payments methodology instead of the sequestration methodology for three reasons: First, the plain meaning of the Medicare statute required the net payments methodology. Second, the plain meaning of the Budget Control Act — the source of the sequestration mandate — independently required the net payments methodology. And third, even if none of the relevant statutes compelled one methodology over another, CMS changed its interpretation of the hospice cap provision when it directed the sequestration methodology and failed to adhere to the required administrative procedures for giving notice of the change.

This court reviews the district court's grant of summary judgment *de novo*, *Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079, 1082–83 (D.C. Cir. 2015), and the underlying decision of the Board pursuant to the "considerable deference" standard of the Administrative Procedure Act, *Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 661 (D.C. Cir. 1994). To

the extent the Board's decision is based "on the [text] of the Medicare Act itself, [the court] owe[s] deference [to the Board] under *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843–45 [(1984)]." *Id.* Under *Chevron*, the court considers two questions: first, whether Congress "directly addressed" the issue in dispute, *id.* (quoting *Chevron*, 467 U.S. at 843), and second, if "the statute is silent or ambiguous with respect to the specific issue," *id.*, whether "the agency's answer is based on a permissible construction of the statute," *id.* (quoting *Chevron*, 467 U.S. at 843).

**A.**

"In addressing a question of statutory interpretation, we begin with the text." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020) (quoting *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018)); *see Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004). The Medicare statute provides that reimbursements for hospice care are subject to a cap:

> The amount of payment made under [Medicare Part A] for hospice care provided by (or under arrangements by) a hospice program for an accounting year may not exceed the "cap amount" for the year (computed under subparagraph (B)) multiplied by the number of [M]edicare beneficiaries in the hospice program in that year (determined under subparagraph (C)).

42 U.S.C. § 1395f(i)(2)(A). The parties agree that this provision establishes a figure known as the "aggregate cap" — the total reimbursement a hospice care provider is entitled to receive from Medicare in any given fiscal year. The provision also sets out a formula for calculating a hospice's aggregate cap: the fixed annual cap amount in § 1395f(i)(2)(B), which is tied to the Consumer Price Index, multiplied by the number of

eligible patients the hospice cared for in the relevant year as defined in § 1395f(i)(2)(C). According to the Secretary, that is all the provision does. According to Gentiva, it does more — it also sets out a formula for calculating overpayments.

Gentiva maintains that the plain meaning of the hospice cap statute mandates that fiscal-year-end reconciliation use the net payments methodology instead of the sequestration methodology. On Gentiva's reading, the statute's requirement that the "amount of payment made . . . may not exceed the 'cap amount' for the year," § 1395f(i)(2)(A), serves to define overpayments as the difference between the net periodic payments actually disbursed over the fiscal year (the "amount of payment made") and the aggregate cap. To calculate the amount of overpayment that a hospice must return, Gentiva reasons, CMS and its contractors must therefore compare the hospice's net disbursements to its aggregate cap without regard to any other factor.

Critical to Gentiva's interpretation is the view that the phrase "amount of payment made" refers to the total periodic payments actually disbursed during the relevant year. That is not, however, the most natural way to read the text. *Cf., e.g.*, *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2176 (2021). In the hospice cap provision, the word "made" functions not as a past-tense verb, as Gentiva asserts, but rather as an adjectival past participle modifying "amount of payment." *See The Chicago Manual of Style Online* § 5.90 (17th ed. 2017). The phrase "amount of payment made" thus should not be read as referring to a discrete historical amount, as Gentiva suggests; rather, it refers to "the amount of payment that is made," not "the amount of payment that was made." Indeed, reading the phrase in the past tense, as Gentiva does, renders the rest of the provision ungrammatical and incoherent; the statute goes on to provide

that hospice reimbursement "may not exceed" the aggregate cap — a present-tense prohibition. The plain meaning of the statute is simply that hospice reimbursements are capped; while the statute teaches how to *calculate* the aggregate cap, no particular formula is given for *applying* the aggregate cap. Gentiva's view that the plain meaning of the statute requires the net payments methodology is therefore incorrect.

The Supreme Court considered similar statutory language in *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718 (2017), and reached the same conclusion. At issue there was the Fair Debt Collection Practices Act's definition of "debt collector" as "anyone who 'regularly collects or attempts to collect . . . debts owed or due . . . another.'" *Id.* at 1721 (quoting 15 U.S.C. § 1692a(6)). The consumer-plaintiffs maintained that this definition covered not only third parties who collect debts belonging to another creditor, but also those who purchase debts from the originating creditor and seek to collect them on their own behalf. *Id.* at 1721–22. This followed from the text, they argued, because the use of the past-tense "owed" meant that "the statute's definition of debt collector captures anyone who regularly seeks to collect debts *previously* 'owed . . . another.'" *Id.* at 1722 (quoting 15 U.S.C. § 1692a(6)). The Court rejected that reading, explaining that "[p]ast participles like 'owed' are routinely used as adjectives to describe the present state of a thing — so, for example, *burnt* toast is inedible, a *fallen* branch blocks the path, and (equally) a debt *owed* to a current owner may be collected by him or her." *Id.* Further, the Court pointed out, reading "owed" in the past tense did not fit with the statutory context: "due" was plainly in the present tense, and it was not plausible that "Congress set two words cheek by jowl in the same phrase but meant them to speak to entirely different periods of time." *Id.* Just so here — "made" simply "describe[s] the present state," *id.*, of the "amount of payment" in question. And reading "made" as

past-tense puts it out of step with the present-tense "may not exceed."

Gentiva's attempts to bolster its plain meaning argument fare no better. It points to the Medicare regulations, which provide that "[p]ayments made to a hospice during a cap period that exceed the cap amount are overpayments and must be refunded." 42 C.F.R. § 418.308(d). As with the hospice cap statute, however, Gentiva reads too much into the regulation, which announces that payment in excess of the aggregate cap must be refunded without providing any formula for calculating overpayments. Nor does the relevant Department guidance support Gentiva's reading: it states that "[t]he total actual Medicare payments made for services furnished to Medicare beneficiaries during the cap year . . . are compared to the aggregate cap for this period." Medicare Benefit Policy Manual, ch. 9, § 90.2. But the following section explains that "'[t]otal actual Medicare payments made for services furnished to Medicare beneficiaries during the cap year' refers to Medicare payments for services rendered beginning November 1 and ending October 31, *regardless of when payment is actually made.*" *Id.* § 90.2.1 (emphasis added). That undermines Gentiva's position that overpayments must be calculated strictly by comparing the sum of checks actually cut during the cap year to the aggregate cap; in fact, the policy manual recognizes that the amount of reimbursement that is subject to the cap may embrace other "amount[s] of payment" as well.

Ultimately, the regulations and guidance do not support Gentiva's contention that the statute unambiguously requires the net payments methodology. Section 1395f(i)(2)(A) does not mandate any one methodology for applying the aggregate cap. Gentiva also maintains that those regulations and policy statements are entitled to deference. But because these

provisions cannot bear the meaning Gentiva ascribes to them, any deference to them would not help Gentiva.

Because the plain meaning of the statute gives no instruction as to how overpayments should be calculated, the court concludes the statute is "silent . . . with respect to the specific issue" of what methodology CMS must use in applying the aggregate cap. *Marymount Hosp.*, 19 F.3d at 661 (quoting *Chevron*, 467 U.S. at 843). Further, Gentiva offers no reason to doubt that "the [Secretary's] answer is based on a permissible construction of the statute," *id.* (quoting *Chevron*, 467 U.S. at 843). Nothing in the text of § 1395f(i)(2)(A) suggests the sequestration methodology may not be used; in a non-sequestration year, it achieves the same result as the net payments methodology. And the sequestration methodology harmonizes the Medicare statute with the requirements of the Budget Control Act. *See infra* Part II.B. Furthermore, the court concludes that the Board's decision represents a reasonable understanding of the statute.

**B.**

In 2011, Congress passed the Budget Control Act, Pub. L. No. 112-25, 125 Stat. 240, amending the Balanced Budget and Emergency Deficit Control Act of 1985, Pub. L. No. 99-177, 99 Stat. 1038. The amended statute provided a mechanism of "budget enforcement," 2 U.S.C. § 900(b), known as sequestration, that would automatically be triggered if Congress failed to achieve certain deficit-reduction thresholds, *see id.* § 901a.

Under the Budget Control Act, when sequestration is triggered, federal spending must be reduced by a certain percentage across the board (with certain kinds of spending exempted from sequestration altogether). *See id.*; *id.* §§ 905, 906(d)(7). Medicare is in a special category: It is subject to

sequestration, but only up to a point. If the Act requires an overall reduction in spending greater than 2%, Medicare will experience only a 2% reduction, *id.* § 901a(6)(A), and all other non-exempt federal programs can be subject to a greater reduction to compensate for the lesser reduction in Medicare spending, *id.* § 901a(7).

When sequestration is triggered under the Act, OMB calculates the reduction in Medicare payment amounts needed to meet the overall percentage reduction required:

> To achieve the total percentage reduction in those programs required by section 902 or 903 of this title . . . , OMB shall determine, and the applicable Presidential order under section 904 of this title shall implement, the percentage reduction that shall apply . . . to individual payments for services furnished during the one-year period beginning on the first day of the first month beginning after the date the order is issued . . . such that the reduction made in payments under that order shall achieve the required total percentage reduction in those payments for that period.

2 U.S.C. § 906(d)(1) (hereinafter, the "total reduction provision").

According to Gentiva, independent of the Medicare statute, the total reduction provision mandates the net payments methodology because it provides that the percentage reduction required for sequestration applies "to individual payments for services," *id.* Gentiva maintains that CMS should have applied the 2% reduction to each periodic payment disbursed and stopped there, as those are the only "individual payments" in the hospice reimbursement process. By using the sequestration methodology, CMS instead applied the 2% reduction to a figure other than the "individual payments for services" in

violation of the Budget Control Act, Gentiva maintains. Again, Gentiva's focus is too narrow.

"It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000)). Viewing the phrase "individual payments" in isolation ignores key statutory indications of the meaning of the total reduction provision as a whole. Indeed, "individual payments" lies between two other phrases that contradict Gentiva's interpretation. The provision opens by explaining that "[t]o achieve the *total percentage reduction* in [the affected programs]," OMB is to calculate the percentage reduction required. 2 U.S.C. § 906(d)(1) (emphasis added). And it closes by explaining that OMB is to calculate that percentage reduction "*such that* the reduction made in payments under that order shall achieve the *required total percentage reduction in those payments for that period*." *Id.* (emphasis added). Read in its full context, the provision makes clear that whatever reductions are made, they *must* achieve the "total percentage reduction" demanded to effectuate the sequestration. Here, OMB determined that a 2% reduction in Medicare spending was required. *OMB 2013 Sequestration Report* at 1, app. Any methodology of calculating overpayments that resulted in a less than 2% reduction of Medicare spending as a whole would have been impermissible under the total reduction provision.

Using the net payments methodology that Gentiva advocates would have brought the total reduction of Medicare spending below 2%, violating the clear mandate of the total reduction provision. As the district court ably illustrated, *see Gentiva*, 523 F. Supp. 3d at 88–89, and as explained above by

reference to Hospice B, hospices that exceeded their aggregate cap for the year during which sequestration was in effect would see no reduction in their total reimbursement under Gentiva's net payments methodology, and in turn the Medicare program would see no reduction in spending as to those hospices under sequestration. To achieve an overall 2% reduction program-wide, Medicare must reduce reimbursements to each and every hospice (and each and every non-hospice Medicare provider) by the full 2%. If, for example, 90 below-cap hospices experience a 2% cut and 10 above-cap hospices experience no cut, the "total percentage reduction" across those 100 hospices would amount to only 1.8%. Not only would that result fail to achieve the "total percentage reduction" required, it would violate the mandate of § 906(d)(2) that "[r]eductions in payments . . . pursuant to a sequestration order . . . shall be at a uniform rate . . . across [Medicare] programs and activities."

Read as a whole, the statute permits the sequestration methodology, which "achieve[s] the total percentage reduction" required, 2 U.S.C. § 906(d)(1). Considering the sequestration process in light of the Medicare scheme confirms this interpretation. As the Secretary points out, the Medicare statute governing hospice reimbursements "deals with such payments on an aggregate, annual basis with respect to individual providers." Appellee's Br. 23. Final, binding determinations as to the amount of the reimbursement a provider is owed are made on an annual basis. *See* 42 U.S.C. § 1395f(i)(1)(A), (2)(A). In the context of hospice reimbursements, therefore, "individual payments" is best understood to refer to the final Medicare allowable payment for an individual hospice after cap-year-end reconciliation, rather than to the periodic disbursements, which are merely preliminary. Even as to the narrow question of the meaning of "individual payments," therefore, the court does not agree that

the plain meaning of the statute requires the net payments methodology.

Gentiva takes issue with the view that the periodic disbursements are preliminary and that any reconciliation takes place under the hospice reimbursement scheme, as hospices are paid at a flat *per diem* rate, as opposed to a fee-for-service or cost-based model under which a year-end review might deem certain costs unallowable and adjust reimbursement accordingly. But, as the Secretary explains, there are a number of adjustments that might take place at cap-year end even under the flat-rate hospice system — a beneficiary might be retroactively determined ineligible for hospice benefits, *see* 42 C.F.R. § 418.302(e)(1), or another source of hospice care coverage might be discovered for some beneficiaries, *see* 42 U.S.C. § 1395y(b)(2), or the application of the inpatient cap might reduce the hospice's total reimbursement even before application of the aggregate cap, *see* 42 C.F.R. § 418.302(f)(5). Thus, while the periodic reimbursements issued throughout the year are something more than mere estimates of the amount owed to the hospice providers, they are also something less than "payments," as the issuance of any given disbursement is not an agreement by CMS that the provider will actually be entitled to that amount in the final analysis.

Because the Secretary's chosen methodology comports with the statutory text, purpose, and operation, Gentiva has not shown that the Board's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Marymount Hosp.*, 19 F.3d at 661 (quoting 5 U.S.C. § 706(2)(A)).

## C.

Finally, Gentiva maintains that CMS changed its existing policy — the net payments methodology — when it adopted

the sequestration methodology, and failed to provide a reasoned explanation for such a change. Specifically, Gentiva asserts that the process behind the adoption of the sequestration methodology deprived Gentiva of fair notice of how sequestration would affect its reimbursements. Even assuming that Gentiva was entitled to fair notice before application of the sequestration methodology, Gentiva's position is without merit.

When an agency changes its "existing polic[y]," it must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). This requires "at least 'display[ing] awareness that it is changing position' and 'show[ing] that there are good reasons for the new policy.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

This, however, was no "'[u]nexplained inconsistency' in agency policy," *Encino Motorcars*, 579 U.S. at 222 (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). Gentiva's objection rests on the unstated assumption that the adoption of the sequestration methodology represented a reinterpretation of the Medicare statute when, in fact, it represented a blank-slate implementation of the Budget Control Act. The sequestration methodology therefore was not a change in agency policy at all.

Nor has Gentiva demonstrated that the net payments methodology was the agency's policy prior to sequestration. For much the same reasons, the statutes, regulations, and policy statements governing hospice care reimbursements do not mandate the net payments methodology, so Gentiva's reliance on those provisions as evidence of the agency's pre-sequestration policy is misplaced. Similarly, the few individual

aggregate-cap determination notices Gentiva offers as examples of the net payments methodology do not establish a "longstanding practice" of using that methodology, Appellant's Br. 29. Gentiva points to the hospices' original cap determinations from 2013 — before the issuance of the Technical Direction Letter adopting the sequestration methodology — as evidence that the net payments methodology was CMS policy before sequestration. As the district court correctly observed, those cap determinations issued by the contractors were subject to revision (even in a non-sequestration year) and the contractors' initial, erroneous approach did not represent agency policy. *See Gentiva*, 523 F. Supp. 3d at 99. Similarly, the single cap determination Gentiva has identified from before 2013 — the year sequestration was in effect — could not by itself establish any longstanding practice. That revised determination, moreover, does not appear to use the net payments methodology, contrary to Gentiva's characterization; in fact, it appears to use the sequestration methodology, albeit with zeros for every sequestration-related line item, as sequestration was not in effect that year.

To the extent Gentiva maintains that the Secretary was required to act by notice-and-comment rulemaking, Gentiva misperceives the interplay between the Medicare statute and the Budget Control Act. Gentiva invokes the Medicare statute's requirement that "[n]o rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing . . . the payment for services . . . under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1)," 42 U.S.C. § 1395hh(a)(2); *see also id.* §§ 1395hh(c)(1), (e)(1). But as the Secretary points out, the statute makes those requirements applicable to changes promulgated "under this subchapter,"

that is, the Medicare statute.  *Id.* § 1395hh(a)(2).  When CMS adopted the sequestration methodology, it did not act pursuant to its authority to effectuate the Medicare statute, but rather pursuant to the mandate of the Budget Control Act.  The formal procedures that accompany rulemaking under the Medicare statute were therefore inapplicable.  *Cf. Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816–17 (2019).

Accordingly, the court affirms the district court's grant of summary judgment to the Secretary and denial of summary judgment to Gentiva.