# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 14, 2023        Decided September 1, 2023

No. 22-5214

ADVOCATE CHRIST MEDICAL CENTER, ET AL.,
APPELLANTS

v.

XAVIER BECERRA, SECRETARY, UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-1519)

*Daniel F. Miller* argued the cause for appellants. With him on the briefs were *Sara Jean MacCarthy* and *Heather D. Mogden*.

*Stephanie R. Marcus*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Mark B. Stern*, Attorney, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General.

2

Before:  HENDERSON, KATSAS, and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*:  Hospitals treating Medicare beneficiaries receive greater reimbursements to the extent that the beneficiaries are also entitled to supplemental security income benefits under Title XVI of the Social Security Act. The Secretary of Health and Human Services understands this population to include only patients receiving cash payments during the month in question.  Various hospitals contend that this population also includes patients receiving a subsidy under Medicare Part D and vocational training.  The district court disagreed with the hospitals, as do we.

I

A

This case involves benefits under three different titles of the Social Security Act.  Title XVIII of that Act establishes the Medicare program, which provides health insurance to the elderly and disabled.  Part A of Medicare covers inpatient hospital services, and Part D affords a prescription-drug benefit.  Title XVI of the Social Security Act provides monthly cash payments, known as supplemental security income benefits, to financially needy individuals who are elderly, disabled, or blind.  Title XI, among other things, provides vocational rehabilitation services for the disabled.  In the United States Code, the Social Security Act is codified as chapter 7 of Title 42, and its individual titles are codified as subchapters of chapter 7.  The Department of Health and Human Services administers Medicare, while the Social Security Administration administers the SSI program and the vocational rehabilitation services under Title XI.

Hospitals receive fixed payments for services provided to Medicare beneficiaries regardless of their actual costs. The payment formula, which approximates the costs that a well-run hospital would incur to provide the treatment at issue, seeks to "encourage efficiency by rewarding cost effective hospital practices." *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011) (cleaned up). One variable in the formula is a "disproportionate share hospital" adjustment, which provides additional compensation to hospitals serving an "unusually high percentage of low-income patients." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 150 (2013). This adjustment accounts for the fact that low-income patients tend to be in worse health and therefore costlier to treat. *Id.*

The DSH adjustment derives from two statutory formulas known as the Medicare fraction and the Medicaid fraction. The Medicare fraction represents the percentage of a hospital's Medicare patients who are low-income, as measured by their entitlement to SSI benefits. The Medicaid fraction represents the percentage of a hospital's patients who are eligible for Medicaid, which provides health benefits to a different population of low-income individuals. The sum of these fractions, which is called the hospital's "disproportionate patient percentage," reflects all low-income patients served. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi).

This case turns on the Medicare fraction, which consists of the following:

> the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter and were entitled to supplementary security income benefits (excluding

any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter ….

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). In plain English, the numerator of the Medicare fraction is the number of patient days attributable to Medicare patients who are entitled to SSI benefits, while the denominator is the number of patient days attributable to all Medicare patients.

For our purposes, the key statutory terms are "entitled to benefits under part A" and "entitled to supplementary security income benefits … under subchapter XVI." The Department of Health and Human Services considers a patient "entitled to benefits under part A" if he satisfies the threshold requirements for Part A benefits—*i.e.*, if he is over 65 or suffers a long-term disability—regardless of whether Medicare pays for the specific service rendered. *See* Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates, 69 Fed. Reg. 48,916, 49,098–99, 49,246 (Aug. 11, 2004). The Supreme Court recently endorsed this interpretation in *Becerra v. Empire Health Foundation*, 142 S. Ct. 2354 (2022).

The SSI program provides cash payments to financially needy individuals who are aged, blind, or disabled. 42 U.S.C. § 1382(a). Individuals must apply for this benefit. *Id.* § 1382(c)(7). Eligibility is determined monthly, depending on a beneficiary's "income" and "resources" during the month. *Id.* § 1382(c)(1). Once an individual qualifies for the cash payment during a particular month, he remains enrolled in the SSI program until failing to qualify for the payment for twelve

consecutive months.  *See* 20 C.F.R. § 416.1335.  At that point, the individual must reapply to receive future payments.

Enrollees in the SSI program may receive two further benefits beyond the cash payments.  First, they become eligible for a subsidy under Medicare Part D.  *See* 42 U.S.C. § 1395w-114(a)(3)(B)(v)(I).  Each enrollee receives this subsidy for at least six months regardless of whether he continues to qualify for the monthly payments.  42 C.F.R. § 423.773(c)(2).  Second, blind or disabled enrollees may access the Ticket to Work and Self-Sufficiency Program, which provides vocational rehabilitation services through state agencies or private employment networks.  42 U.S.C. § 1320b-19.  In some circumstances, SSI enrollees may use these services even after they fail to qualify for the monthly payments.  *See* 20 C.F.R. §§ 411.100–660.

For purposes of the Medicare fraction, HHS interprets the phrase "entitled to supplementary security income benefits … under subchapter XVI" to denote only those patients who are entitled to the cash payment during the month in question.  In administering the SSI program, SSA assigns codes to track monthly (1) whether enrollees qualified for the payment and (2) the reason why or why not.  For example, the code "N01" indicates that an enrollee failed to receive a payment for a particular month ("N") because of excess income during that month ("01").  After studying the various codes used by SSA, HHS concluded that codes C01, M01, and M02 capture the relevant universe of individuals entitled to the monthly payment.  *See* Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System Changes and FY 2011 Rates, 75 Fed. Reg. 50,042, 50,281

(Aug. 16, 2010).[1] To help HHS calculate the Medicare fraction of individual hospitals, SSA gives HHS data in the form of "monthly indicators," which denote whether SSI enrollees were coded as C01, M01, or M02 in any given month. *See id.* at 50,276. HHS calculates the Medicare fraction by comparing this data regarding who qualified for monthly cash payments against its own data regarding the inpatient admissions of individuals entitled to Part A benefits. *Id.* at 50,278.

To provide for a check on HHS's work, Congress enacted section 951 of the Medicare Prescription Drug, Improvement, and Modernization Act (MMA). It requires HHS to give each hospital "the data necessary" for the hospital "to compute the number of patient days used in computing the disproportionate patient percentage … for that hospital." Pub. L. No. 108-173 § 951, 117 Stat. 2066, 2427 (2003) (codified at 42 U.S.C. § 1395ww note). To comply with the MMA, the agency gives hospitals data of the "matched patient-specific Medicare Part A inpatient days/SSI eligibility data on a month-to-month basis." Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates, 70 Fed. Reg. 47,278, 47,440 (Aug. 12, 2005). This amounts to a list of inpatient days along with a binary yes-or-no marker indicating whether the patient for those days was counted as being entitled to SSI benefits. HHS neither receives from SSA, nor gives to the hospitals, the individual codes reflecting SSA's determination of why specific enrollees were or were not entitled to SSI benefits month-to-month.

---

[1] Code C01 indicates that an SSI enrollee receives an automated cash payment. Codes M01 and M02 reflect enrollees whose cash payments SSA manages manually.

7

B

The plaintiffs in this case are more than 200 different hospitals seeking additional Medicare reimbursement for fiscal years 2006 to 2009. The hospitals dispute HHS's calculation of their respective Medicare fractions for those years. They contend that the phrase "entitled to supplementary security income benefits" includes all patients enrolled in the SSI program at the time of hospitalization, even if they did not then qualify for the monthly cash payment. The Provider Reimbursement Review Board, a tribunal within HHS, denied relief to the hospitals. So did the Centers for Medicare and Medicaid Services, which administers Medicare for the Secretary. Consistent with the Secretary's longstanding view, CMS reasoned that "[b]ecause SSI is a cash benefit, only a person who is actually paid these benefits can be considered 'entitled' to these benefits." J.A. 568.

The hospitals sought review of the reimbursement decisions in the district court. They continued to argue that HHS has misconstrued the Medicare Act. Alternatively, they claimed that the HHS matching process is arbitrary even under HHS's construction. Finally, through a claim for mandamus, the hospitals sought an order directing HHS to provide them with the SSI payment codes for their respective patients. The district court rejected these claims and granted summary judgment to HHS. *Advoc. Christ Med. Ctr. v. Azar*, No. 17-cv-1519, 2022 WL 2064830 (D.D.C. June 8, 2022).

II

We review the grant of summary judgment *de novo*. *Gentiva Health Servs., Inc. v. Becerra*, 31 F.4th 766, 775 (D.C. Cir. 2022). Like the district court, we apply the arbitrary-and-capricious standard from the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A); 42 U.S.C. § 1395*oo*(f)(1). Under

that deferential standard, an agency decision need only be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1155 (2021).

We have also deferentially reviewed HHS interpretations of the Medicare Act under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984). *See Gentiva*, 31 F.4th at 775. However, we need not apply the *Chevron* framework if we conclude that the agency has correctly construed the governing statute. *See Empire*, 142 S. Ct. at 2362.

III

We begin with the dispute over the phrase "entitled to supplementary security income benefits … under subchapter XVI." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). HHS reads it to cover only Medicare beneficiaries who are entitled to SSI cash payments at the time of their hospitalization. The hospitals read it to cover Medicare beneficiaries who are enrolled in the SSI program at the time of their hospitalization, regardless of whether they receive a cash payment at that time. To justify their position, the hospitals contend that SSI benefits under subchapter XVI include not only cash payments but also the Medicare Part D subsidy and vocational rehabilitation services.

The hospitals are mistaken. At every turn, subchapter XVI is about cash payments for needy individuals who are aged, blind, or disabled. Its title promises "supplemental security income" for those individuals. 42 U.S.C. ch. 7, subch. XVI. Its statement of purpose is "to provide supplemental security income" to those individuals. *Id.* § 1381. Its "[b]asic entitlement to benefits" is that aged, blind, or disabled individuals, once determined not to have income or resources above the statutory cutoffs, "shall, in accordance with and subject to the provisions of this subchapter, be paid benefits." *Id.* § 1381a. Section 1382 sets forth "[t]he benefit under this

subchapter"—not simply "a" benefit—in specific dollar amounts. *Id.* § 1382(b). Scores of later provisions elaborate on when and how this cash benefit is to be paid out.[2]

Section 1320b-19 of Title 42 confirms this point. Housed in subchapter XI, it requires SSA to establish the Ticket to Work program, which provides vocational rehabilitation services to blind or disabled individuals who are "eligible for supplemental security income benefits under subchapter XVI." 42 U.S.C. § 1320b-19(k)(4). For purposes of this program, section 1320b-19 states expressly that "[t]he term 'supplemental security income benefit under subchapter XVI' means a cash benefit under section 1382 or 1382h(a) of this title." *Id.* § 1320b-19(k)(5). As noted above, section 1382 sets forth "[t]he" monthly cash benefit under subchapter XVI, *id.* § 1382(b), and section 1382h(a) sets forth a substitute monthly cash benefit for certain individuals who qualify under section

---

[2] *See*, *e.g.*, 42 U.S.C. § 1382(e)(1)(B) (setting forth "the benefit under this subchapter," in dollars, for certain individuals in treatment facilities); *id.* § 1382(h) (rules for "determining eligibility for, and the amount of, benefits payable under this section"); *id.* § 1382b(c)(1)(A)(iv) (rules for determining "the amount of the maximum monthly benefit payable under section 1382(b)"); *id.* § 1382c(f)(1) (rules for "determining eligibility for and the amount of benefits for" certain married individuals); *id.* § 1382d(a)(2) (treatment of minors "with respect to whom benefits are paid under this subchapter"); *id.* § 1382e(d)(5)(C) (permissible use of funds "appropriated for payment of benefits under this subchapter"); *id.* § 1382f ("Cost-of-living adjustments in benefits"); *id.* § 1382h(b)(1)(D) (assessment whether certain "earnings" provide a "reasonable equivalent of the benefits under this subchapter"); *id.* § 1382i(b)(2) (certain "payments" qualify as "supplemental security income benefits" for certain purposes); *id.* § 1382j(a) (rules for determining "the amount of benefits under this subchapter" for aliens); *id.* § 1383 ("Procedure for payment of benefits … under this subchapter").

1382 in some months but not others, *id.* § 1382h(a)(1). Because "identical words used in different parts of the same act are intended to have the same meaning," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (cleaned up), the phrase "supplemental security income benefits under subchapter XVI" (or its equivalent "supplementary security income benefits … under subchapter XVI") bears the same meaning in calculating the Medicare fraction in subchapter XVIII that it bears (1) throughout subchapter XVI and (2) in determining eligibility for the Ticket to Work program in subchapter XI.

The hospitals respond that the word "benefits" can include cash or non-cash benefits, tangible or intangible. True enough, but the question here turns on what counts as "income" benefits "under subchapter XVI." Neither of the two benefits that the hospitals cite fits that description. Medicare Part D benefits are housed in subchapter XVIII. So too is the provision making individuals "who are recipients of supplemental security income benefits" also eligible for a prescription-drug subsidy. 42 U.S.C. § 1395w-114(a)(3)(B)(v)(I). The prescription-drug subsidy is thus a non-cash benefit provided under subchapter XVIII, not the monthly cash benefit provided under subchapter XVI. Likewise, the Ticket to Work benefits cited by the hospitals are provided under subchapter XI, which requires SSA to establish that program for blind and disabled individuals "to obtain employment services, vocational rehabilitation services, or other support services from an employment network." *Id.* § 1320b-19(a). Subchapter XI sets forth the metes and bounds of that program, which SSA may run through state agencies that choose to administer approved plans, *see id.* § 1320b-19(c)(1), or through private employment networks selected by SSA, *see id.* § 1320b-19(d)(4). Subchapter XVI merely provides that, if a state chooses to participate in the Ticket to Work program, SSA may reimburse the state for the cost of providing covered vocational benefits to SSI enrollees. *Id.* § 1382d(d). That simply provides a

funding mechanism for a subchapter XI benefit—and one that expressly defines the term "supplemental security income benefits under subchapter XVI" as "a cash benefit under section 1382 or 1382h(a)." *Id.* § 1320b-19(k)(5).

The hospitals further argue that *Empire* compels their construction of the phrase "entitled to supplementary security income benefits." *Empire* held that the phrase "entitled to benefits under part A," as used to determine the Medicare fraction, covers patients who meet Part A's requirement of being elderly or disabled, even if Medicare does not pay for specific treatments because of coverage limitations, alternative insurance, or the like. 142 S. Ct. at 2364. The hospitals reason that if the phrase "entitled to benefits under part A" covers patients who meet basic eligibility requirements without regard to specific payment decisions, then so too must the adjacent phrase "entitled to [SSI] benefits."

This argument misses key distinctions between the Part A and SSI schemes. First, Part A benefits extend well beyond payment for specific services at specific times. As *Empire* explained, a beneficiary who reaches a Part A coverage limit for eye care still has coverage for a knee replacement, so he remains "entitled to benefits under part A" even if Medicare does not pay for his current medical needs. 142 S. Ct. at 2363. There is no comparable parallel in the SSI context because, as shown above, the phrase "[SSI] benefits … under subchapter XVI" means only cash payments. Moreover, age or chronic disability makes a person eligible for Part A benefits "without an application or anything more," and individuals rarely if ever lose this eligibility over time. *Id.* at 2363–64. The same does not hold true for SSI, where individuals routinely ping-pong in and out of "eligibility" depending on fluctuations in their income or wealth from one month to another. 42 U.S.C. § 1382(a), (c). Given this structure, it makes little sense to say

that individuals are "entitled" to the benefit in months when they are not even eligible for it.

Because we agree that the Secretary offered the correct interpretation of the Medicare fraction, we adopt it without considering any question of *Chevron* deference.

IV

The hospitals next argue that even under HHS's own construction of the Medicare Act, its matching process was arbitrary and capricious. We disagree.

First, the hospitals contend that HHS arbitrarily excluded patients whose SSI benefits were withheld under the so-called "cross-program recovery" scheme. When an SSI beneficiary receives an overpayment from another SSA program, SSA may correct the mistake by reducing SSI benefits correspondingly. 42 U.S.C. § 1320b–17. The hospitals assert that SSA assigns to individuals whose benefits are so withheld the E01 code, which indicates a loss of SSI eligibility, even though these individuals receive an SSI benefit that cancels another monetary liability. This assertion is mistaken. As the government explained at oral argument, individuals whose SSI benefits are clawed back under the cross-program recovery scheme still are assigned the C01, M01, or M02 codes, and therefore remain "entitled to [SSI] benefits" in the agency's calculation of the Medicare fraction.

Second, the hospitals contend that HHS unreasonably focused on whether patients receive SSI payments when hospitalized because the payments depend on income and resource levels from earlier months. But "eligibility" for the SSI benefit "for a month" depends on the individual's income, resources, and other characteristics "in such month." 42 U.S.C. § 1382(c)(1). Thus, if an individual satisfies these criteria during one month yet does not receive the payment until a later

month, HHS still counts the individual as "entitled to [SSI] benefits" during the first month.

Third, the hospitals contend that HHS unreasonably excluded from the Medicare fraction individuals assigned codes "S" and "E02." Because the hospitals first raised this argument in their reply brief, we do not consider it. *See Abdullah v. Obama*, 753 F.3d 193, 199 (D.C. Cir. 2014).

V

Invoking the Mandamus Act, 28 U.S.C. § 1361, the hospitals seek an order compelling HHS to provide them with the payment codes assigned by SSA to their respective patients. The hospitals want this data to verify or challenge CMS's calculation of their respective Medicare fractions.

Mandamus against an executive official is a drastic remedy to be "invoked only in extraordinary circumstances." *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (cleaned up). The plaintiff must show (1) a clear and indisputable right to the relief sought; (2) the violation of a clear legal duty; and (3) the absence of an adequate alternate remedy. *See Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). Even if these requirements are met, the plaintiff must also show "compelling equitable grounds" for relief. *Id.*

To establish the necessary rights and duties, the hospitals invoke section 951 of the MMA. It requires HHS to give each hospital the "data necessary" for the hospital "to compute the number of patient days used in computing [its] disproportionate patient percentage." 117 Stat. at 2427. The hospitals have received the matched data that HHS itself uses to calculate this percentage. But the hospitals want more than simply a binary code reflecting whether specific patient days were attributed to individuals coded by SSA as C01, M01, or M02. Instead, the

hospitals want, for all patient days attributed to SSI enrollees, the specific codes used by SSA to track why those individuals did or did not qualify for the monthly cash payment.

Section 951 does not unambiguously compel release of this data. According to the hospitals, section 951 requires HHS to disclose what they describe as "input data" to help them re-do the entire determination of the Medicare and Medicaid fractions from start to finish. On the other hand, section 951 could simply mean that HHS must provide wholesale data that it uses for the actual computation. We are tempted to say that this ambiguity alone is enough to doom the claim, for mandamus is unavailable when the alleged duty depends on a statutory construction that is "not free from doubt." *Power v. Barnhart*, 292 F.3d 781, 786 (D.C. Cir. 2002) (cleaned up). But there is a simpler ground of decision: What section 951 cannot mean is that HHS must give hospitals data that it never received from SSA in the first place. And SSA does *not* provide HHS with the specific codes assigned to individual patients. *See* 75 Fed. Reg. at 50,276.

## VI

The district court correctly granted summary judgment to the Secretary of Health and Human Services.

*Affirmed.*