**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| SILVERADO HOSPICE, INC., a Delaware corporation; PROCARE HOSPICE, LLC, a Delaware limited liability corporation, *Plaintiffs-Appellants*, <br><br> v. <br><br> XAVIER BECERRA, Secretary of United States Department of Health and Human Services, *Defendant-Appellee.* | No. 20-56348 <br><br> D.C. Nos. 8:19-cv-01007-DMG-RAO 8:19-cv-01098-DMG-RAO 2:19-cv-05096-DMG-RAO <br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted March 18, 2022
San Francisco, California

Filed August 1, 2022

Before: Morgan Christen and Daniel A. Bress, Circuit
Judges, and Barbara M. G. Lynn,[*] District Judge.

Opinion by Judge Bress

---

[*] The Honorable Barbara M. G. Lynn, Chief United States District Judge for the Northern District of Texas, sitting by designation.

# SUMMARY**

## Medicare

The panel affirmed the district court's summary judgment in favor of the government in an action brought by hospice providers who alleged that the Centers for Medicare and Medicaid Services' method of implementing the Budget Control Act's across-the-board cuts for hospice reimbursements was contrary to the Medicare statute and the Budget Control Act.

This case involves the complex interaction between two statutory limits on federal Medicare spending relating to hospice care. Hospices that treat Medicare beneficiaries receive periodic reimbursements throughout the year from the Centers for Medicare and Medicaid Services ("CMS"), but the Medicare statute caps hospices' aggregate annual reimbursement. The Budget Control Act separately requires the federal government to implement across-the-board cuts—commonly known as "sequestration"—to direct spending programs (including Medicare) when certain statutory conditions are met, as they were here.

The triggering of sequestration required CMS to determine how to cut hospice spending in a manner consistent with the Medicare statute's cap requirements. CMS ultimately issued a technical direction letter ("TDL") to its Medicare Administrative Contractors ("MAC") providing instructions on how to address sequestration amounts relating to the cap calculation. The TDL explained

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that its overpayment calculation method would apply retroactively to the 2013 and 2014 fiscal years.

The plaintiff hospices exceeded their aggregate caps in the 2013 fiscal year, and three Silverado hospices also exceeded their aggregate caps in the 2014 fiscal year.  In 2015, plaintiffs' MACs issued notices of its aggregate cap determinations for both fiscal years.  In each of the eight notices, the MAC included the details of its cap calculations under the TDL's multi-step method and requested refunds of the overpayment amounts.  Plaintiffs appealed their cap determinations to the Provider Reimbursement Review Board ("PRRB"), arguing that their MAC had failed to calculate the aggregate cap using the "actual net amount of payment received by the hospice provider."  Instead, the MAC had calculated their overpayments using the TDL method.  Plaintiffs argued that the MAC's calculation method was contrary to 42 U.S.C. § 1395f(i)(2)(A), which specifies how the aggregate cap is calculated.  The PRRP upheld the MAC's overpayment calculations.

The panel held that CMS correctly concluded that the Budget Control Act required it to reduce the total annual amounts paid to hospices, not only the periodic reimbursements, and that the agency's chosen method for implementing sequestration was consistent with the Medicare statute.  CMS adopted a method that harmonized the Budget Control Act and the Medicare statute, ensuring the necessary percentage reduction to Medicare spending without altering the statutorily mandated calculation of the annual hospice cap.  Plaintiffs' preferred method, by contrast, would not achieve sequestration's required spending reductions.

Having concluded that the Budget Control Act required a reduction in annual hospice payments, and not just periodic reimbursements, the panel next considered whether the agency's chosen method was consistent with other language in the Medicare statute, and specifically the cap calculation methodology. The panel held that it was. The statute's plain language established that the "amount of payment made" does not refer to historical, periodic reimbursements, but rather the payment to which a hospice is legally entitled in a fiscal year.

Finally, the panel held that the agency was not required to undertake notice-and-comment rulemaking before implementing the Budget Control Act's sequestration mandate. The agency's sequestration method, as reflected in the TDL and the PRRB's decisions, did not amount to the "establish[ment]" or "change[]" of a substantive legal standard governing payment for services under Medicare, within the meaning of 42 U.S.C. § 1395hh. Rather, Congress enacted the Budget Control Act's sequestration requirements, and the President implemented sequestration when the statutory conditions were triggered.

---

## COUNSEL

Brian M. Daucher (argued), Sheppard Mullin Richter & Hampton LLP, Costa Mesa, California; Matthew G. Halgren, Sheppard Mullin Richter & Hampton LLP, San Diego, California; for Plaintiffs-Appellants.

McKaye L. Neumeister (argued) and Michael S. Raab, Appellate Staff; Tracy L. Wilkison, Acting United States Attorney; Brian M. Boynton, Acting Assistant Attorney General; Civil Division, United States Department of

Justice, Washington, D.C.; Daniel J. Barry, Acting General Counsel; Janice L. Hoffman, Associate General Counsel; Susan Maxson Lyons, Deputy Associate General Counsel for Litigation; W. Charles Bailey Jr., Attorney; United States Department of Health & Human Services, Washington, D.C.; for Defendant-Appellee.

W. Jerad Rissler, Arnal Golden Gregory LLP, Atlanta, Georgia; William A. Dombi, Director, Center for Health Law, Washington, D.C.; for Amicus Curiae National Association for Home Care & Hospice.

## OPINION

BRESS, Circuit Judge:

This case involves the complex interaction between two statutory limits on federal Medicare spending relating to hospice care. Hospices that treat Medicare beneficiaries receive periodic reimbursements throughout the year from the Centers for Medicare and Medicaid Services (CMS), but the Medicare statute caps hospices' aggregate annual reimbursement. The Budget Control Act separately requires the federal government to implement across-the-board cuts—commonly known as "sequestration"—to direct spending programs (including Medicare) when certain statutory conditions are met, as they were here.

The plaintiffs are hospice providers who allege that CMS's method of implementing sequestration for hospice reimbursements is contrary to the Medicare statute and the Budget Control Act. We conclude that the plaintiffs' challenge is without merit. CMS adopted a method that harmonized the Budget Control Act and the Medicare statute, ensuring the necessary percentage reduction to

Medicare spending without altering the statutorily mandated calculation of the annual hospice cap. Plaintiffs' preferred method, by contrast, would not achieve sequestration's required spending reductions. For these reasons and those that follow, we affirm the district court's grant of summary judgment to the government.

I

Silverado Hospice, Inc. and ProCare Hospice, LLC operate Medicare-certified hospices in Southern California, five of which are at issue here. Some of the hospices' patients are elderly or disabled individuals who receive palliative care and whose treatment is covered by their insurance under Medicare Part A. 42 U.S.C. § 1395d(d). A Medicare beneficiary is eligible for hospice benefits if he or she is terminally ill, meaning a life expectancy of six months or less. *Id.* § 1395f(a)(7)(A); *id.* § 1395x(dd)(3)(A).

CMS administers the hospice benefit on behalf of the Department of Health and Human Services (HHS). Part of the agency's responsibility entails controlling the program's costs, while ensuring that hospices are properly reimbursed for their care of Medicare beneficiaries. We start with the relevant background on hospice reimbursements, which frames this dispute.

A

Medicare reimbursements for hospice care are partially a matter of timing. So that hospices receive funds throughout the year for the care they provide to Medicare beneficiaries, CMS periodically reimburses hospices using a Medicare Administrative Contractor (MAC) as intermediary. *See* 42 U.S.C. § 1395g(a); *id.* § 1395h(c)(2)(A)–(B); 42 C.F.R. § 418.302(d)–(e). The

reimbursements are based on a pre-set, per-patient amount for each day that a hospice provides care to a Medicare beneficiary. 42 U.S.C. § 1395f(i)(1); *see also* 42 C.F.R. §§ 418.302, 418.306; *Back v. Sebelius*, 684 F.3d 929, 930 (9th Cir. 2012).

However, the reimbursements are subject to an aggregate annual cap per hospice facility. *See* 42 U.S.C. § 1395f(i)(2)(A); 42 C.F.R. § 418.308(a); *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 649–50 (9th Cir. 2011). The Medicare statute provides:

> The amount of payment made under this part for hospice care provided by . . . a hospice program for an accounting year may not exceed the "cap amount" for the year (computed under subparagraph (B)) multiplied by the number of medicare beneficiaries in the hospice program in that year (determined under subparagraph (C)).

42 U.S.C. § 1395f(i)(2)(A). The aggregate cap is calculated retrospectively at the close of each fiscal year, based on how many unique patients a hospice treated that year. 42 C.F.R. § 418.308(c). A hospice whose Medicare reimbursements exceeded the aggregate cap must repay the difference. *Id.* at § 418.308(d). For example, if a MAC made $1,200 in periodic payments throughout the year but the hospice is subject to a $1,000 annual cap, the hospice would need to remit $200 at the end of the fiscal year. About ten percent of hospices exceeded the cap in 2010.

The precise calculation of the aggregate cap amount is determined based on 42 U.S.C. § 1395f(i)(2)(B)–(C). Section 1395f(i)(2)(B) provides the calculation for the per-patient cap amount, which is in turn multiplied by the

"number of medicare beneficiaries" as determined by § 1395f(i)(2)(C). *Id.* § 1395f(i)(2)(A). In 1984, the aggregate cap's first year, the per-patient cap amount was $6,500. *Id.* § 1395f(i)(2)(B)(i). But the per-patient amount was indexed to inflation and rose to $26,157.50 in 2013, the first fiscal year at issue here. *Id.*; *Medicare Program; FY 2015 Hospice Wage Index and Payment Rate Update*, 79 Fed. Reg. 50,452, 50,471 (Aug. 22, 2014). The Medicare regulations also provide detailed rules for counting the "number of medicare beneficiaries" a hospice treats in a fiscal year. *See* 42 U.S.C. § 1395f(i)(2)(C); 42 C.F.R. § 418.309(b)(2). The parties do not dispute the method of calculating the per-patient cap amount. Nor do they dispute the method for determining the "number of medicare beneficiaries."

Once a fiscal year ends, hospices have five months to self-determine their aggregate cap amounts, file notice with their MACs, and "remit any overpayment due." 42 C.F.R. § 418.308(c). The MAC then "issues the final cap determination" and "reconcile[s] the final payments" to the hospice. 79 Fed. Reg. at 50,473. If the MAC determines that a hospice exceeded the aggregate cap and has an outstanding overpayment, the MAC's letter containing the "final determination of program reimbursement" also includes a demand for repayment. 42 C.F.R. § 405.1803(a)–(b); *id.* § 418.308(c).

If a hospice disputes the MAC's final cap determination, and the amount in controversy is at least $10,000, the hospice can appeal to the Provider Reimbursement Review Board (PRRB), an HHS tribunal. *See* 42 U.S.C. § 1395*oo*(a). Unless the Administrator of CMS elects to review it, the PRRB's decision constitutes HHS's final decision. 42 U.S.C. § 1395*oo*(f)(1); 42 C.F.R.

§ 405.1875(a).  A hospice can then obtain judicial review of the agency's final decision in federal court.  42 U.S.C. § 1395*oo*(f)(1).

B

The aggregate annual cap is not the only restriction on Medicare's hospice spending.  The Balanced Budget and Emergency Deficit Control Act of 1985, Pub. L. No. 99-177, 99 Stat. 1038, as amended by the Budget Control Act of 2011, Pub. L. No. 112-25, 125 Stat. 240, requires the President to make automatic spending cuts (the aforementioned "sequestration") to federal spending when certain statutory conditions are triggered.  *See* 2 U.S.C. §§ 900–03.  When sequestration is triggered, the President must reduce the federal government's direct spending by a certain percentage based on the Budget Control Act's mandates.

The Budget Control Act generally requires the Office of Management and Budget (OMB) to calculate a uniform percentage by which the budgets of nonexempt spending programs are to be sequestered.  *See* 2 U.S.C. §§ 901a(6), 935(a)(1).  Certain spending programs, however, are exempt from sequestration.  2 U.S.C. § 905.  Although Medicare Part A is not exempt, the Budget Control Act has special rules for Medicare sequestration.  *See id.* §§ 901a(6)(A), 906(d).

Relevant here, the Budget Control Act limits the sequestration of spending for certain Medicare programs to a flat two percent across-the-board reduction.  *Id.* § 901a(6)(A).  One type of Medicare spending subject to the two-percent reduction is "individual payments for services furnished" under Medicare Part A, which covers hospice care.  *Id.* §§ 901a(6)(A), 906(d)(1)(A).  To secure the proper

"total percentage reduction" in covered "programs," the Budget Control Act requires that the two-percent reduction in "individual payments for services furnished" during a given fiscal year be applied "such that the reduction made in payments . . . shall achieve the required total percentage reduction in those payments for that period." *Id.* § 906(d)(1).

In March 2013, the statutory conditions for sequestration were triggered. The President accordingly signed a sequestration order requiring federal agencies to implement spending reductions, as calculated by OMB. *See Sequestration Order for Fiscal Year 2013*, 78 Fed. Reg. 14,633 (Mar. 1, 2013). Beginning the following month, MACs reduced their periodic reimbursements to hospices by two percent. When these periodic payments were made, it remained to be seen whether the hospices would ultimately exceed their cap amounts at the end of the year. Although only the 2013 and 2014 fiscal years are at issue here, sequestration has also been implemented every year since.

C

The triggering of sequestration required CMS to determine how to cut hospice spending in a manner consistent with the Medicare statute's cap requirements. Although one might think that reducing spending by two percent should not be so difficult, it turns out that the matter is somewhat involved. It is complex because having reduced periodic payments by two percent, the agency then had to devise a back-end reconciliation procedure that addressed both the aggregate cap and the prior payments. And the agency had to do so in a way that complied with the Budget Control Act, the Medicare statute, and Medicare regulations.

After a period of uncertainty about what the rules should be, CMS ultimately issued a technical direction letter (TDL) to its MACs providing instructions on how to address sequestration amounts relating to the cap calculation. The TDL explained that its overpayment calculation method would apply retroactively to the 2013 and 2014 fiscal years. Although hospice providers were frustrated by the apparent revision in how some MACs were assessing amounts owed for cap overages, the agency concluded that its methodology was necessary to implement sequestration.

The TDL established a multi-step process for reconciling the aggregate cap with the Budget Control Act's required two-percent reduction in Medicare Part A spending. First, the MAC adds amounts *withheld* from a hospice provider's periodic reimbursements due to sequestration—that is, the two percent skimmed off the top of every reimbursement throughout the year—to the aggregate periodic reimbursement actually paid. This sum is the pre-sequestration reimbursement amount. It is equivalent to what the hospice's aggregate reimbursement amount would have been, but for sequestration.

Second, the MAC compares the pre-sequestration reimbursement amount to the hospice's aggregate cap, calculated as specified in § 1395f(i)(2). If the pre-sequestration reimbursement amount exceeds the aggregate cap, the difference between the two amounts is the pre-sequestration overpayment amount. In other words, it is the amount the hospice would have received in excess of the aggregate cap, but for sequestration.

Third, if there is an overpayment amount, the MAC reduces the amount by two percent to reflect the actual overpayment the hospice received. This sum constitutes the

post-sequestration overpayment amount that the provider must remit to the MAC.

If this sounds complicated, it is.  But a helpful chart used in *Gentiva Health Services, Inc. v. Cochran*, 523 F. Supp. 3d 81, 88 (D.D.C. 2021), *aff'd*, 31 F.4th 766 (D.C. Cir. 2022), and reproduced by the government in its brief, illustrates the TDL's multi-step method by comparing a hypothetical Hospice A that met its $1,000 cap to a hypothetical Hospice B that exceeded it by $200:

| CMS TDL Method | | |
|---|---|---|
| | Hospice A | Hospice B |
| A. Annual Aggregate Cap | $1,000 | $1,000 |
| B. Actual Preliminary Payments | $980 | $1,176 |
| C. Sequestered Amount | $20 | $24 |
| D. Pre-sequestration Reimbursement Amount (B+C) | $1,000 | $1,200 |
| E. Pre-sequestration Amount in Excess of Cap (D-A) | $0 | $200 |
| F. 2% of the Pre-Sequester Amount Overpayment | $0 | $4 |
| G. Revised Payment in Excess of Cap (E-F) | $0 | $196 |
| H. Final Amount Retained by Hospice (B-G) | $980 | $980 |

While the agency's method is complex, its ultimate effect is clear: each hospice ultimately receives 98% of the compensation it would have received but for sequestration. This means hospices that exceed the aggregate cap, even with two percent of their periodic reimbursements being withheld throughout the year, still have their total annual

capped reimbursement amount reduced by two percent. Under the agency's sequestration method, Hospice B would repay $196 and, like Hospice A, would retain $980.

Under plaintiffs' preferred method, by contrast, CMS would only sequester two percent of the periodic reimbursements that hospices receive during the fiscal year. If a hospice reached or exceeded its aggregate cap even with reduced periodic reimbursements, as the plaintiff hospices here did, then based on the cap it would see no reduction in the total amount of payment it kept at year end under sequestration. Using the chart above, if the agency adopted plaintiffs' preferred method, Hospice B would have to repay only $176 (B minus A in the above chart) and would retain $1,000—the same amount that it would have retained before sequestration was implemented. But the agency rejected plaintiffs' method.

D

The plaintiff hospices exceeded their aggregate caps in the 2013 fiscal year, and the three Silverado hospices also exceeded their aggregate caps in the 2014 fiscal year. In 2015, plaintiffs' MAC issued notices of its aggregate cap determinations for both fiscal years. In each of the eight notices, the MAC included the details of its cap calculations under the TDL's multi-step method and requested refunds of the overpayment amounts. To give a sense of the numbers, comparing the TDL calculation method to plaintiffs' desired method, for Silverado's three hospices in fiscal year 2014, the disputed repayment amounts were $116,649.59, $36,104.78, and $129,920.95.

Plaintiffs appealed their cap determinations to the PRRB. They argued that their MAC had failed to calculate the aggregate cap using the "actual net amount of payment

received by the hospice provider." The MAC had calculated their overpayments using the TDL method we described above. But plaintiffs argued that the MAC's calculation method was contrary to § 1395f(i)(2)(A), which specifies how the aggregate cap is calculated.

The PRRB upheld the MAC's overpayment calculations. The PRRB concluded that "nothing in the Medicare statutory or regulatory provisions governing hospice payment" required MACs to use the "*net* reimbursement to the hospice." Rather, the terms "amount paid" and "amount of payment" in the Medicare statute had to be "viewed on a cap year basis," and it was to the aggregate year-end amount that sequestration applied. The PRRB also recognized that, if CMS had directed MACs to pay periodic reimbursements without any reductions and then apply the two percent reduction only at the end of the fiscal year, "assessing and collecting overpayments on *all* Medicare-participating hospices . . . would not be administratively practicable." The Administrator of CMS declined to review the PRRB's decisions.

Plaintiffs filed three actions in federal court, which were then consolidated. The district court granted the government's motion for summary judgment. The district court concluded that CMS was required to reduce its total hospice spending for the year, and that the agency's method did so in a manner consistent with the Medicare statute.

## II

We review de novo the district court's summary judgment decision. *KST Data, Inc. v. DXC Tech. Co.*, 980 F.3d 709, 713 (9th Cir. 2020). We set aside the agency's decisions under the Administrative Procedure Act if they are "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 42 U.S.C. § 1395*oo*(f)(1); 5 U.S.C. § 706(2)(A).

We hold that CMS correctly concluded that the Budget Control Act required it to reduce the total annual amounts paid to hospices, not only the periodic reimbursements, and that the agency's chosen method for implementing sequestration is consistent with the Medicare statute. Plaintiffs' preferred method, by contrast, would not reduce hospice spending by the required two percent.

A

The relevant provision of the Budget Control Act, as it applies to Medicare programs, provides:

> To achieve the total percentage reduction in those programs required by section 902 or 903 of this title . . . OMB shall determine . . . the percentage reduction that shall apply, with respect to the health insurance programs under title XVIII of the Social Security Act—
>
> > (A) in the case of Parts A and B of such title, to individual payments for services furnished during the one-year period . . .
>
> such that the reduction made in payments under that order shall achieve the required total percentage reduction in those payments for that period.

2 U.S.C. § 906(d)(1).

CMS interpreted § 906(d)(1) to require a two-percent reduction in the total annual payment made to a hospice

provider, after application of the annual cap amount. Plaintiffs argue, however, that "individual payments" for Medicare Part A in § 906(d)(1)(A) refers to hospices' periodic reimbursements. They thus contend that § 906(d)(1)(A) required only a reduction in the periodic reimbursement amounts, not the total annual amounts. Plaintiffs acknowledge that Congress could have applied sequestration to a hospice's aggregate annual payments after application of the cap, but insist that Congress instead referred only to periodic reimbursements.

Plaintiffs are mistaken. The "individual payments for services" referenced in § 906(d)(1), read in context with the rest of the Budget Control Act, does not refer to hospices' periodic reimbursements. The Budget Control Act is concerned with reducing federal spending on "the health insurance *programs*," not just some preliminary spending components of those programs. *See id.* § 906(d)(1) (emphasis added). The relevant "program" here is Medicare Part A. This is the "direct spending" that the Budget Control Act requires the agency to reduce. *See id.* § 901a(6)(A); *see also id.* § 901a(7) (referencing "the percentage reduction for the Medicare programs"). That is consistent with § 906(d)(1)'s mandate to achieve a "*total* percentage reduction." The "total" here is keyed off the cap amount because the periodic reimbursements are effectively preliminary in nature, always subject to the cap rules requiring year-end reconciliation.

To accept plaintiffs' contrary interpretation of § 906(d)(1), meanwhile, would be to conclude that hospices whose sequestration-reduced periodic reimbursements nonetheless exceed their aggregate caps face no annual reduction in their reimbursements. The implication of plaintiffs' argument is that Congress, in attempting to enact

across-the-board cuts to federal spending, in fact failed to reduce Medicare Part A spending for certain hospices by the intended percentage. We are hesitant to read such a result into § 906(d)(1) because we do "not lightly conclude that Congress enacted a self-defeating statute." *Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019).

To illustrate the implications of plaintiffs' position, we could imagine that ten hospices receive reimbursements, the aggregate cap is $100, nine hospices qualify for exactly $100 in pre-sequestration periodic reimbursements, and the remaining hospice qualifies for $110. Before sequestration, the government's spending would be $1,000 (the $100 aggregate cap across ten hospices). After sequestration's two-percent reduction, we would expect the government to spend $980. Applying two-percent reductions to periodic reimbursements throughout the year, the first nine hospices would be paid $98 and the tenth would be paid $107.80. The first nine would be under the cap and would owe the government nothing. The tenth would be over the cap. Under the agency's method, the tenth hospice would repay $9.80, putting total program spending at $980. Under plaintiffs' proposed method, the tenth hospice would only repay $7.80. In that case, the government's total spending would be $982—only a 1.8% reduction. Accepting plaintiffs' argument would be tantamount to concluding that the Budget Control Act failed to achieve its desired objective. And it would produce the anomalous result that hospices operating below their caps face a two percent reduction, but hospices that exceed their caps do not.

Fortunately, we need not conclude that Congress intended this anomaly because the Budget Control Act and the Medicare statute can be read harmoniously. When we combine the Budget Control Act's mandate to reduce

"individual payments," 2 U.S.C. § 906(d)(1)(A), with the Medicare statute's description of what constitutes "payment for hospice care," 42 U.S.C. § 1395f(i), it becomes clear that the relevant payment that must be reduced during sequestration is the aggregate amount that a hospice is legally entitled to for a fiscal year. It is not just the periodic reimbursements that a hospice receives throughout the year that must be reduced.

The relevant portion of the Medicare statute, § 1395f(i), is titled "payment for hospice care." The statute provides that "the amount paid to a hospice program with respect to hospice care for which payment may be made" is "[s]ubject to the limitation" of § 1395f(i)(2), which is the aggregate cap. *Id.* § 1395f(i)(1). The aggregate cap provision, in turn, specifies that the "amount of payment made under this part for hospice care provided by . . . a hospice program for an accounting year may not exceed" the aggregate cap. *Id.* § 1395f(i)(2). These provisions of the Medicare statute contemplate "payment" being determined in the aggregate, based on the fiscal year as a whole. They do not refer to periodic reimbursements. Reimbursements that exceed the aggregate cap at the end of the fiscal year are not "payment for hospice care" to which a hospice is legally entitled under § 1395f(i)(1).

Taking § 906(d)(1) of the Budget Control Act and § 1395f(i) of the Medicare statute together, then, it is clear that the statutes require the agency to reduce the total annual payment that hospices receive by two percent. This requirement necessarily applies when a hospice exceeds the aggregate cap. In that event, the agency must reduce the amount that the hospice would receive after application of the aggregate cap because the cap amount is the amount that

the agency otherwise would have paid the hospice absent sequestration.

When courts can "interpret statutes to be coherent and internally consistent," they should. *Freeman v. Gonzales*, 444 F.3d 1031, 1039 (9th Cir. 2006). Here, the "text, context, and structure" of the Budget Control Act and the Medicare statute confirm that the agency was required to reduce the annual amounts paid to hospices by two percent. *See Becerra v. Empire Health Found.*, 142 S. Ct. 2354, 2368 (2022) (noting in a recent challenge to HHS reimbursements that "[t]ext, context, and structure all support calculating the Medicare fraction HHS's way.").

B

Having concluded that the Budget Control Act required a reduction in annual hospice payments, and not just periodic reimbursements, we now consider whether the agency's chosen method is consistent with other language in the Medicare statute, and specifically the cap calculation methodology. We hold that it is.

The Medicare statute specifies that the "*amount of payment made* under this part for hospice care . . . for an accounting year may not exceed the 'cap amount' for the year (computed under subparagraph (B)) multiplied by the number of medicare beneficiaries in the hospice program in that year (determined under subparagraph (C))." 42 U.S.C. § 1395f(i)(2)(A) (emphasis added). On this point, the parties' dispute turns on the meaning of the italicized phrase. Plaintiffs maintain that "amount of payment made" should be interpreted as "payments *actually* made" to a hospice during a fiscal year, such that the agency can determine overpayment amounts only by factoring in actual, historical payments that the hospices received, without adding in the

sequestered portions of periodic reimbursements that hospices did not receive. For its part, the agency does not interpret "amount of payment made" to refer to actual, historical periodic reimbursements, but rather to the amount that a hospice is *legally entitled to* in a fiscal year.

The agency's interpretation is the much better one. As a textual matter, the Medicare statute does not contain any reference to historic or "actual" payments made, but instead places a legal limit—in the form of the aggregate cap—on the amount that a hospice can be reimbursed in a given fiscal year. 42 U.S.C. § 1395f(i)(2). And the word "made" is not the past tense of a verb, as plaintiffs contend, but a past participle that functions as an adjective and takes the passive voice. *See Gentiva Health Servs., Inc. v. Becerra*, 31 F.4th 766, 776 (D.C. Cir. 2022). It places an upper bound on the amount of reimbursement a hospice can receive; it does not refer to past periodic reimbursements.

As a logical matter, too, "amount of payment made" cannot refer to payments "actually" made. If it did, § 1395f(i)(2) would require the agency to ensure that periodic reimbursements to a hospice do not exceed an amount that can only be determined months, and sometimes years, later. *See* 79 Fed. Reg. at 50,473 (noting that hospices must "wait at least 3 months after the end of the cap year" before self-determining aggregate cap overpayments). Even once final cap determinations are calculated after the close of a fiscal year, there can be subsequent adjustments to a hospice's cap that could require the hospice to remit further overpayment amounts. *See* 42 U.S.C. § 1395g(a) (contemplating "necessary adjustments" to the amount owed to a Medicare provider "on account of previously made overpayments or underpayments"); 42 C.F.R. § 418.309(b)(2) ("The aggregate cap calculation for a given

cap year may be adjusted after the calculation for that year based on updated data."). The statute's plain language thus establishes that the "amount of payment made" does not refer to historical, periodic reimbursements, but rather the payment to which a hospice is legally entitled in a fiscal year. *See* 42 U.S.C. § 1395f(i)(2)(A).[1]

The Medicare statute does require that the aggregate cap itself be calculated according to § 1395f(i)(2)(B) and (C). But that point is inapposite here, making plaintiffs' reliance on *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644 (9th Cir. 2011), and *Lion Health Services, Inc. v. Sebelius*, 635 F.3d 693 (5th Cir. 2011), misplaced. Both decisions invalidated a regulation that purported to alter the aggregate cap calculation itself, contrary to the statute. Here, by contrast, the agency has not altered the statutory method by which the aggregate cap is calculated. Rather, the agency has validly interpreted "amount of payment made" to include the sequestered portions of hospices' periodic reimbursements, and to not be limited to amounts actually paid to hospices after the sequestered portions are withheld.

In short, the agency's sequestration method is driven by three considerations. First, the Budget Control Act requires a reduction in the total amount of payment to which a hospice is entitled. Second, in circumstances in which a

---

[1] Notably, hospice payments are also subject to a separate "inpatient cap," which limits reimbursement for inpatient services to "20 percent of the aggregate number of days" in a year that a Medicare beneficiary received hospice care. 42 U.S.C. § 1395x(dd)(2)(A)(iii). This cap also cannot be applied until the end of the year, reinforcing the agency's decision to interpret "amount of payment made" as a year-end determination, and belying plaintiffs' argument that overpayment amounts can be calculated by comparing the aggregate cap and the sum of periodic reimbursements.

hospice exceeds the aggregate cap, the sequestration mandate requires the agency to reduce the amount that a hospice is entitled to *after* the application of the aggregate cap. Third, the Medicare statute does not specify that the aggregate cap must be subtracted from the sum of a hospice's historical periodic reimbursements. Given these considerations, the agency reasonably instituted a sequestration method that is consistent with the text of both the Budget Control Act and the Medicare statute. The agency's method gives effect to sequestration without impermissibly altering the calculation of the aggregate cap. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018) (explaining that courts have a "duty to interpret Congress's statutes as a harmonious whole rather than at war with one another").

Plaintiffs' further arguments to the contrary are unpersuasive. The agency's sequestration method is not inconsistent with 42 C.F.R. § 418.308(d), which simply states that "[p]ayments made to a hospice during a cap period that exceed the cap amount are overpayments and must be refunded." This regulation did not purport to interpret "amount of payment made" in § 1395f(i)(2)(A). The same is true of the non-binding description in the then-operative version of the *Medicare Benefit Policy Manual*, ch. 9, § 90.2. Both sources merely confirmed that the payment to which a hospice is legally entitled in a fiscal year is limited by the aggregate cap.

Finally, we note that our decision is fully consistent with the conclusions of the only other federal court of appeals to address the interplay between the Budget Control Act's sequestration mandate and the Medicare statute's reimbursement provisions for hospice care. Earlier this year, the D.C. Circuit affirmed a district court's grant of summary

judgment to the government on a hospice provider's identical challenge to CMS's sequestration method. *Gentiva*, 31 F.4th at 768, 777. *Gentiva* held that the agency's "methodology comports with the statutory text, purpose, and operation," and "harmonizes the Medicare statute with the requirements of the Budget Control Act." *Id.* at 777, 779. Our analysis accords with that of the D.C. Circuit.

## III

Plaintiffs have raised one final issue: whether the agency was required to undertake notice-and-comment rulemaking before implementing the Budget Control Act's sequestration mandate. Like the D.C. Circuit, *see id.* at 780–81, we reject this argument as well.

The Medicare statute requires that a "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing . . . the payment for services . . . under this subchapter" (*i.e.*, under Medicare) must be "promulgated by the Secretary by regulation." 42 U.S.C. § 1395hh(a)(2). And any such regulation is also subject to a 60-day notice-and-comment period. *Id.* § 1395hh(b)(1).

The agency's sequestration method, as reflected in the TDL and the PRRB's decisions, did not amount to the "establish[ment]" or "change[]" of a substantive legal standard governing payment for services under Medicare, within the meaning of § 1395hh. Rather, Congress enacted the Budget Control Act's sequestration requirements, and the President implemented sequestration when the statutory conditions were triggered. It was not the agency that established or changed any legal standard, but Congress that directed the agency to reduce its spending through the

Budget Control Act.   The agency simply abided by congressional and presidential directives.

Plaintiffs' invocation of *Azar v. Allina Health Services*, 139 S. Ct. 1804 (2019), is unpersuasive.   In *Allina*, the Supreme Court held that a new Medicare reimbursement policy was subject to notice-and-comment rulemaking, rejecting the agency's argument that the new policy was exempt because it was merely filling a "gap" left by the Medicare statute and its existing regulations.   139 S. Ct. at 1817.   *Allina* explained that "when the government establishes or changes an avowedly 'gap'-filling policy, it can't evade its notice-and-comment obligations." *Id.*

But *Allina* specifically left open what would happen if "the *statute* itself required" the agency to establish or change a substantive legal standard.   139 S. Ct. at 1816.   Since *Allina*, we have rejected a challenge to a MAC's local coverage determination on this basis, holding that the statutorily required coverage determinations did not "'establish or change' the standard for reimbursement contained in the statute itself," so the plaintiff's "reliance on *Allina* [was] therefore misplaced." *Agendia, Inc. v. Becerra*, 4 F.4th 896, 902 (9th Cir. 2021).   Here, the agency was not establishing a gap-filling policy under the Medicare statute but implementing a new directive required under a separate statute: the Budget Control Act.   *See Gentiva*, 31 F.4th at 780–81 ("When CMS adopted the sequestration methodology, it did not act pursuant to its authority to effectuate the Medicare statute, but rather pursuant to the mandate of the Budget Control Act.").   Notice-and-comment rulemaking under § 1395hh was not required.

*      *      *

The judgment of the district court is

**AFFIRMED.**