**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANTHONY SANDERS; SHAWN HOLZBERGER; JUSTIN DOERING; ROBERT COUGHLIN; VIRGINIA TINOCO, on behalf of themselves and all similarly situated individuals, | No. 22-55663 D.C. No. 2:19-cv-06370-MWF-E |
| *Plaintiffs-Appellants*, v. COUNTY OF VENTURA, | OPINION |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted August 22, 2023
Pasadena, California

Filed November 30, 2023

Before: Johnnie B. Rawlinson and Daniel A. Bress, Circuit
Judges, and Jack Zouhary,[*] District Judge.

Opinion by Judge Bress

---

[*] The Honorable Jack Zouhary, United States District Judge for the
Northern District of Ohio, sitting by designation.

## SUMMARY[**]

### Labor Law

The panel affirmed the district court's grant of summary judgment to the defendant in an action brought under the Fair Labor Standards Act by employees who opted out of their union- and employer-sponsored health plans.

The employees received a monetary credit, part of which was deducted as a fee that was then used to fund the plans from which they had opted out. The employees argued that this opt-out fee should be treated as part of their "regular rate" of pay for calculating overtime compensation under the Act.

The panel held that the opt-out fees were not part of the employees' "regular rate" of pay, but rather were exempted as "contributions irrevocably made by an employer to a trustee or third person pursuant to a bona fide plan for providing" health insurance under 29 U.S.C. § 207(e)(4).

### COUNSEL

David E. Mastagni (argued) and Taylor J. Davies-Mahaffey, Mastagni Holstedt APC, Sacramento, California, for Plaintiffs-Appellants.

Brian P. Walter (argued) and Paul D. Knothe, Liebert Cassidy Whitmore, Los Angeles, California; Emily Gardner,

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Office of Ventura County Counsel, Ventura, California; for Defendant-Appellee.

## OPINION

BRESS, Circuit Judge:

Plaintiff employees who opted out of their union and employer-sponsored health plans received a monetary credit, part of which was deducted as a fee that was then used to fund the plans from which plaintiffs had opted out. Plaintiffs argue that this opt-out fee should be treated as part of their "regular rate" of pay for calculating overtime compensation under the Fair Labor Standards Act (FLSA). 29 U.S.C. § 207(a). We hold that the opt-out fees are not part of the employees' "regular rate" of pay. The fees are exempted as "contributions irrevocably made by an employer to a trustee or third person pursuant to a bona fide plan for providing" health insurance. *Id.* § 207(e)(4). We affirm the grant of summary judgment to the employer.

I

Plaintiffs are Ventura County, California firefighters and law enforcement officers who (except for one plaintiff) are members of two unions, the Ventura County Professional Firefighters' Association (PFA) and the Ventura County Deputy Sheriffs' Association (DSA). The County sponsors various health insurance plans for its eligible employees and their dependents. Under agreements between the unions and the County, plaintiffs were eligible to enroll in union-sponsored health insurance plans instead of the County's plans.

The County manages health benefits for union and non-union employees alike through its Flexible Benefits Program. As part of this "cafeteria plan," the County provides its employees every pay period with a Flexible Benefit Allowance, also known as the "Flex Credit," which employees may use to purchase health benefits on a pre-tax basis. The amount of the Flex Credit for union members is set through negotiation between the County and the unions. If the premium for an employee's chosen health insurance is more than the Flex Credit, the balance of the premium owed is deducted from the employee's pre-tax earnings. If the premium is less than the Flex Credit, the remainder is paid to the employee in cash as taxable earnings. Employees can also waive participation in the Flexible Benefits Program altogether, in which case they do not receive the Flex Credit.

In the early 1990s, the County, in consultation with union representatives, developed another option for employees who did not wish to purchase a sponsored benefits plan yet wanted to retain their Flex Credit. Specifically, an employee who already has medical insurance from another source, such as a spouse's plan, may choose to "opt out" of the Flexible Benefits Program. Employees who opt out are allotted the same Flex Credit but must pay an opt-out fee.

Both the Flex Credit and opt-out fee appear on employees' paystubs: the Flex Credit is listed under "Earnings" and the "opt-out fee" appears as a "before tax deduction." The County subtracts the opt-out fee from the Flex Credit and then pays the balance to the employee in cash. Union members pay the same opt-out fee as all other County employees who opt out of the Flexible Benefits Program. The amount of the opt-out fee varies from year to year, but it generally comprises most of the Flex Credit. For

example, PFA members in 2022 received a Flex Credit of $482, but their opt-out fee was $334.75, resulting in a net cash payment of $147.25 per pay period.

The opt-out fee consists of three separate charges. First, an "administrative fee" of approximately $14 per pay period covers the cost of running the Flexible Benefits Program and funds various wellness initiatives for all County employees. Second, an "employee health services fee" of about $0.43 per pay period supports a small onsite health clinic. These first two fees are also paid by participants who use their Flex Credit to purchase union or County-sponsored insurance; these fees are simply baked into the insurance premiums.

The third charge, and by far the largest portion of the opt-out fee, is a "risk sharing fee," which is assessed against only those employees who opt out. The risk sharing fee is based on the actuarial assumption that employees who opt out of the insurance plans are likely to be healthier than the average employee, because employees who expect higher medical expenses tend to remain in the plans. The risk sharing fee thus offsets the increased insurance premiums that participating employees would otherwise have to pay as members of a smaller insurance risk pool.

Aside from the small portion of the opt-out fee that is used for employee health services, which plaintiffs do not challenge, the rest of the opt-out fee for DSA and PFA members is remitted to the unions, which put those fees toward the amounts that other union members must pay for their insurance through the union-sponsored plans. For non-union employees, the opt-out fees are remitted to the County's medical insurance carriers to fund the County-sponsored plans.

Plaintiffs opted out of the Flexible Benefits Program and were paid in cash the balance of the Flex Credit less the opt-out fee.  The County treated this residual cash payment as part of plaintiffs' regular rate of pay when calculating their overtime compensation.  But the County did not include in that calculation the value of the opt-out fee.

Plaintiffs filed this putative class action under the FLSA challenging that determination.  *See* 29 U.S.C. § 216(b). They argued that the exclusion of the opt-out fee from their "regular rate" of pay resulted in the County underpaying plaintiffs for overtime work, in violation of the FLSA.  *See id.* § 207(a), (e).   The district court granted summary judgment to the County, concluding that the opt-out fee was properly excluded from plaintiffs' regular rate of pay under a statutory exception for health plan contributions.  *See id.* § 207(e)(4).

This appeal followed.  We review the grant of summary judgment de novo.  *Silverado Hospice, Inc. v. Becerra*, 42 F.4th 1112, 1118 (9th Cir. 2022).

## II

The FLSA generally prohibits an employer from requiring a covered employee to work more than forty hours in any workweek unless the employer pays the employee overtime compensation "at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  The statute defines "regular rate" "to include all remuneration for employment paid to, or on behalf of, the employee," subject to specified exceptions.  *Id.* § 207(e).  One such exception is at issue here: an employee's "regular rate" of pay does not include "contributions irrevocably made by an employer to a trustee or third person pursuant to a bona fide plan for providing old-age,

retirement, life, accident, or health insurance or similar benefits for employees." *Id.* § 207(e)(4).

Plaintiffs argue at the outset that we should not even consider the import of the § 207(e)(4) exemption for benefits contributions because in their paystubs, the entire Flex Credit amount was listed as earnings, with the opt-out fee shown as a pre-tax deduction. Relying on our decision in *Flores v. City of San Gabriel*, 824 F.3d 890 (9th Cir. 2016), plaintiffs maintain that the FLSA requires the whole Flex Credit, including the opt-out fee, to be included in their regular rate of pay. Plaintiffs are mistaken.

In *Flores*, the City of San Gabriel provided its employees with a designated sum that they could use to purchase medical benefits, but any employee who supplied proof of alternate coverage could forgo the benefits and instead directly receive that sum in cash. *Id.* at 896. We concluded that these "cash-in-lieu of benefits payments" were not excluded under § 207(e)(4) because they were not paid "to a trustee or third person," as that statutory exception requires. *Id.* at 901–02. The County here complied with this aspect of *Flores*: it treated the cash it paid to plaintiffs—the difference between the Flex Credit and the opt-out fee—as part of plaintiffs' regular rate of pay when calculating overtime compensation.

But *Flores* did not consider opt-out fees like the ones at issue here, and nothing in *Flores* supports plaintiffs' theory that the opt-out fee is itself part of plaintiffs' regular rate of pay. On the contrary, in *Flores* we distinguished between the City's contributions to employee benefits and the other amounts it paid in cash to employees. While the latter formed part of the regular rate of pay, whether the former could be excluded depended on whether the City's benefits

program was a "bona fide plan" under § 207(e)(4). *Id.* at 902. Plaintiffs would treat the amounts that the County paid in cash and used for benefits as equivalent, but *Flores* drew a distinction between the two based on how the funds were used.

Plaintiffs' argument that the opt-out fee should be treated like the cash-in-lieu payments in *Flores* rests on a misunderstanding of the opt-out fee. Under the Flexible Benefits Program, employees are only entitled to a cash payment representing the balance of the Flex Credit after the opt-out fee is deducted. The opt-out fee is directed to the unions to fund the employee health plans, or, for non-union employees, to the third-party insurance companies administering the plans.

The nature of the arrangement is significant under our precedent. We have explained that "what is included in the regular rate of pay . . . 'must be discerned from what actually happens under the governing employment contract.'" *Clarke v. AMN Servs., LLC*, 987 F.3d 848, 853 (9th Cir. 2021) (quoting *Newman v. Advanced Tech. Innovation Corp.*, 749 F.3d 33, 37 (1st Cir. 2014)); *see also Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 996 (9th Cir. 2017). Thus, in *Clarke*, which concerned the exclusion from the regular rate of pay of certain per diem benefits under § 207(e)(2), we asked whether the payments "are functioning as compensation." 987 F.3d at 854; *see also id.* at 853 ("[A] payment's *function* controls whether the payment is excludable from the regular rate under § 207(e)(2) . . . .").

In this case, the opt-out fee does not function like the cash payment in *Flores*. Indeed, the opt-out fee is not provided to the plaintiffs in cash at all, and employees have

no right under the program to access that amount as cash-in-lieu. From the functional perspective that our precedents endorse, what "actually happen[ed]" under the Flexible Benefits Program, *Clarke*, 987 F.3d at 853 (citation omitted), is that the opt-out fee amounts were plowed back into the health plans, with plaintiffs receiving in cash only the amount left over after the opt-out fees were subtracted.

Ignoring the practical reality of these transactions, plaintiffs focus on the fact that their paystubs listed the Flex Credit as "Earnings" subject to a "before-tax deduction" (the opt-out fee). But the County sets its paystubs to align with the Internal Revenue Code, not the FLSA. Plaintiffs cite no authority suggesting that the tax accounting concepts reflected in their paystubs are dispositive of whether sums must be included in an employee's regular rate of pay under the FLSA. *Cf. Baouch v. Werner Enters., Inc.*, 908 F.3d 1107, 1113–14 (8th Cir. 2018) (explaining that IRS requirements are "not synonymous" with the obligations imposed by the FLSA). In relying on their paystubs, plaintiffs improperly focus on the "label" affixed to the opt-out fees rather than the "substance or function" of those fees. *Clarke*, 987 F.3d at 856.

For these reasons, this case is not resolved by plaintiffs' theory that they were directly paid the entire Flex Credit in cash. *Flores* treated as "cash-in-lieu of benefits" the cash paid to employees; the opt-out fees here were used for benefits. This case thus turns on the legal import of the opt-out fee and whether it formed part of plaintiffs' regular rate of pay even though it was used to fund the health benefits of other employees.

III

The opt-out fee was properly excluded from plaintiffs' regular rate of pay if it is a "contribution[] irrevocably made by an employer to a trustee or third person pursuant to a bona fide plan for providing . . . health insurance or similar benefits for employees."   29  U.S.C. § 207(e)(4).   The County as the employer bears the burden of establishing that the opt-out fee amounts are excluded from the regular rate of pay under a statutory exception.  *See Clarke*, 987 F.3d at 853.  Although we previously held that these exemptions should be interpreted narrowly, the Supreme Court in *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (2018), later clarified that "FLSA exemptions are construed under 'a fair (rather than a "narrow") interpretation.'"  *Clarke*, 987 F.3d at 853 (quoting *Encino Motorcars*, 138 S. Ct. at 1142).

Here, plaintiffs do not dispute that the opt-out fee amount was irrevocably provided to third parties (the unions and insurance companies).  Instead, plaintiffs argue that (1) the exception in § 207(e)(4) does not apply to them, and (2) the County's Flexible Benefits Program is not "bona fide."  We address each argument in turn.

A

Plaintiffs first maintain that § 207(e)(4) does not apply because the opt-out fee was not used to support plaintiffs' health care, as plaintiffs had opted out of the union and County plans.  Plaintiffs believe that § 207(e)(4) exempts only employer contributions made for plaintiffs' *own* health care, not for the health care of other employees.

Although it does not appear that any court has addressed this argument, we conclude it lacks merit.  "As in all statutory  interpretation,  'our  inquiry  begins  with  the

statutory text, and ends there as well if the text is unambiguous.'" *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1265 (9th Cir. 2021) (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004)). Section 207(e)(4) exempts from the regular rate of pay "contributions irrevocably made by an employer to a trustee or third person pursuant to a bona fide plan for providing old-age, retirement, life, accident, or health insurance or similar benefits *for employees*." (emphasis added). The opt-out fees here were paid to third parties to fund health care benefits "for employees" of the County. The statutory reference to "employees" does not mean the plaintiffs themselves must receive health insurance through their employer. That plaintiffs chose to opt out of the health plans does not mean the opt-out fees were not used "for employees"; rather, it just means plaintiffs did not wish to receive the health coverage offered to them.

Plaintiffs focus on the statute's direction that the "regular rate" of pay "shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e). From that, plaintiffs argue the exception in § 207(e)(4) should have a parallel earmark requirement, such that it only applies to contributions made for the benefit of the employee's own health care.

The conclusion does not follow because by its text, § 207(e)(4) is not limited to employer contributions made for a particular employee. Plaintiffs rely on the first clause of § 207(e), which describes what the regular rate "shall be deemed to include." But § 207(e) then provides that the regular rate "shall not be deemed to include" the various exclusions, including the exemption applicable to the health plan contributions at issue here. *Id.* § 207(e)(4). Those contributions are to be provided "for employees." Here, they

were.   The plain text of § 207(e)(4) encompasses the County's payment of the opt-out fees to third parties and does not include the implicit limitation plaintiffs seek.

What this means is that § 207(e)(4) permits an employer to exempt from an employee's regular rate of pay employer contributions made pursuant to bona fide health plans that are designed to alleviate the burden of a shrinking risk pool for the employees who choose to remain in the plans.  When an employer, as here, decides to allow employees to retain some portion of an unused health insurance credit, it can permissibly structure the program to prop up the employee health plans without treating the full amount of the health credit as part of the FLSA regular rate of pay.

B

The exclusion for health benefit payments applies only to contributions made to a "bona fide plan."   29 U.S.C. § 207(e)(4).  Plaintiffs argue the County's plans are not bona fide.  We disagree.

The statutory requirement that a plan be "bona fide" reflects the determination that employers should not be able to evade the FLSA's overtime rules through benefits programs designed to pay employees disguised compensation.  *See Loc. 246 Util. Workers Union of Am. v. S. Cal. Edison Co.*, 83 F.3d 292, 296 (9th Cir. 1996) ("If the employer meets the requirements of section 207(e)(4) in making irrevocable contributions to a trust, then those contributions will not be added to the regular pay rate on the theory that they are a form of indirect bonus to the worker."). As we recognized in *Flores*, the FLSA does not define "bona fide plan," but the Department of Labor (DOL) has provided some guidance.  824 F.3d at 902 & n.2.

The DOL has indicated that for § 207(e)(4) to apply, "[t]he primary purpose of the plan must be to provide systematically for the payment of benefits to employees . . . ." 29 C.F.R. § 778.215(a)(2); *see also id.* § 778.1 (explaining that "[t]his part contains the Department of Labor's general interpretations with respect to the meaning and interpretation" of the FLSA's overtime pay rules). The DOL has also addressed the permissibility of cash payments in plan arrangements. It has explained that a plan "will still be regarded as a bona fide plan even though it provides, *as an incidental part thereof*, for the payment to an employee in cash of all or a part of the amount standing to his credit . . . during the course of his employment . . . ." *Id.* § 778.215(a)(5) (emphasis added). As to this "incidental" cash payment proviso, a 2003 DOL Opinion Letter elaborated that a plan may qualify as bona fide if, among other things, "no more than 20% of the employer's contribution is paid out in cash" on a plan-wide basis. U.S. Dep't of Labor, Opinion Letter FLSA2003-4, 2003 WL 23374600, at *3 (July 2, 2003).

We considered the import of this DOL guidance in *Flores*, discussed above. In *Flores*, the City of San Gabriel had a Flexible Benefits Plan that gave employees a designated amount to purchase health benefits, but employees with alternative coverage could receive the unused portion as a cash payment. 824 F.3d at 896. The City did not, however, include any of these cash payments when calculating the employees' regular rate of pay. *Id.*

We first concluded that § 207(e)(4) did not exempt the cash-in-lieu payments from the regular rate of pay calculation because the City paid the sums in cash to employees and not to a trustee or third person. *Id.* 901–02. This is the portion of *Flores* with which the County has

already complied by including the residual cash paid to opt-out employees in their regular rate of pay.  The next question in *Flores* was whether the payments made to trustees or third persons (i.e., the sums provided to purchase health benefits) should also have been included in the "regular rate" of pay calculation.  *Id.* at 902.  The answer turned on whether the City's Flexible Benefits Plan was "bona fide."    We concluded that it was not, and that even amounts paid to third parties for employee benefits should therefore have been included when tabulating overtime.  *Id.* at 903.

We began by explaining that the term "bona fide" was ambiguous, and that because neither party had challenged it, we would defer under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), to DOL's interpretation in 29 C.F.R. § 778.215(a)(5) that a plan could be bona fide even if it provided, "as an incidental part thereof," for cash payments to employees.  *Flores*, 824 F.3d at 902 & n.2.  But we held that we would *not* defer under *Skidmore* to DOL's 2003 Opinion Letter, which would generally find cash payments not "incidental" if they accounted for more than 20% of the employer's total contributions on a plan-wide basis.  *Id.* at 903.  We explained that DOL "wholly fail[ed] to explain its reasoning for the adoption of the 20% ceiling" and had not provided "any rationale for why 20% was chosen as the percentage at which cash payments are no longer an 'incidental' part of the plan." *Id.*

Nevertheless, even without this additional DOL guidance and a bright-line 20% rule, we still found that the City's Flexible Benefits Plan was not "bona fide." *Id.*  We did so because over 40% of the City's total contributions were paid to employees in cash.  *Id.*  When "benefits payments constitute only a bare majority of" total contributions, we held, "[t]he City's cash payments are

simply not an 'incidental' part of its Flexible Benefits Plan under any fair reading of that term." *Id.*

Turning back to the case before us, plaintiffs argue that the County's plans are not bona fide because the entire Flex Credit made available to plaintiffs often exceeded 20% of the County's total contributions for DSA and PFA plan participants.  Plaintiffs acknowledge that *Flores* found unpersuasive any hard-and-fast 20% ceiling for cash contributions plan-wide.  But plaintiffs point out that after *Flores*, the DOL issued a final rule, after notice and comment rulemaking, that included a statement in the preamble reaffirming its position that there should be a 20% cash contribution limit for a plan to be bona fide.  *See* Regular Rate Under the Fair Labor Standards Act, 84 Fed. Reg. 68,736-01, at 68,760–61 (Dec. 16, 2019).

The 2019 Final Rule does not override our holding in *Flores* that the 20% threshold is undeserving of deference. *See Flores*, 824 F.3d at 902 & n.2.  The 2019 Final Rule made no changes to 29 C.F.R. § 778.215(a)(5).  Although this Rule was passed after notice and comment, the DOL's preamble provides no additional support for a 20% ceiling. Instead, it relies on DOL's original 2003 Opinion Letter— the very letter we found unpersuasive in *Flores*, even as we there applied a now-outdated narrow construction of FLSA exemptions that disfavored employers.  824 F.3d at 897, 903; *cf. Encino Motorcars*, 138 S. Ct. at 1142.  *Flores* thus still governs on the question of whether cash payments representing more than 20% of an employer's contributions preclude a plan from being bona fide under § 207(e)(4). Under *Flores*, there is no such bright-line 20% ceiling.

But plaintiffs face another significant problem.  In arguing that the cash payments exceed 20% of the total

contributions for DSA and PFA plan participants, plaintiffs treat the opt-out fee amounts as cash payments. We have already explained above why this is not a correct characterization of the opt-out fees, which were instead irrevocably paid to third parties for the purpose of providing health care to County employees. For the same reasons, the opt-out fees should not be included when determining whether the County has made cash payments that exceed a claimed 20% threshold. From the perspective of whether the Flexible Benefits Program is bona fide, there is no justification for treating the opt-out fee sums, which are in fact being used to fund employee health benefits, as cash payments. Indeed, even the DOL's 2019 Final Rule itself acknowledges that a plan may be "bona fide" if cash payments exceed 20% of total contributions so long as "such payments are used for benefits that are the same or similar to those listed in" § 207(e)(4), which is how the opt-out fee was used here. 84 Fed. Reg. at 68,760–61.

Without the opt-out fees, the County's cash payments to PFA and DSA members were below 20% of total contributions for each year in question. Although the exact contribution percentage varied from year to year, at the highest point in 2021, the County's cash contributions represented 19.15% of its total contributions for DSA members. That number is even lower for PFA members. Thus, even if a strict 20% rule applied, plaintiffs' argument still fails.

Stripped of the 20% cash contribution ceiling, plaintiffs offer no other basis to conclude that the Flexible Benefits Program is not bona fide. They do not claim, for example, that the provision of health benefits is not the "primary purpose" of the Program. 29 C.F.R. § 778.215(a)(2). This case is a far cry from *Flores*, in which over 40% of the

employer's contributions consisted of cash payments. *See* 824 F.3d at 903. And although plaintiffs do assert that the opt-out fee was taken from them "involuntarily," it was plaintiffs who voluntarily chose to participate in the Flexible Benefits Program. The terms of that program, including the opt-out fee, were clearly set forth and negotiated by union representatives. We therefore conclude that the County's Flexible Benefits Program is "bona fide" within the meaning of § 207(e)(4).[1]

\* \* \*

For the foregoing reasons, we hold that the County properly excluded the Flex Credit opt-out fee from plaintiffs' regular rate of pay under 29 U.S.C. § 207(e)(4).

**AFFIRMED.**

---

[1] Our analysis in this opinion disposes of plaintiffs' remaining arguments on appeal, including that the opt-out fee is an unlawful kickback, an unlawful deduction from wages under 29 C.F.R. § 531.37(b), and an improper assignment. These arguments depend on plaintiffs' incorrect theory that the opt-out fee forms part of their regularly paid wages.